762 A.2d 97

**STATE of Maryland**

v.

**Stephen PAGOTTO.**

**No. 99, Sept. Term, 1999.**

Court of Appeals of Maryland.

Nov. 16, 2000.

530

532

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for Petitioner.

Kimberly A. Alley and Henry L. Belsky (Schlachman, Belsky & Weiner, P.A., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE,
RODOWSKY,* RAKER, WILNER, CATHELL and
HARRELL, JJ.

RAKER, Judge.

Respondent, Stephen Pagotto, a sergeant with the Balti-
more City Police Department, was convicted of involuntary
manslaughter and two counts of reckless endangerment in
violation of Maryland Code (1957, 1992 Repl.Vol.) Article 27,
§ 120(a)[1] following a jury trial in the Circuit Court for
Baltimore City. Pagotto noted a timely appeal to the Court of
Special Appeals, contending that the State presented legally
insufficient evidence at trial to sustain his convictions. The
Court of Special Appeals agreed with Pagotto and reversed
the judgment of conviction. *See Pagotto v. State,* 127 Md.App.
271, 732 A.2d 920 (1999). We granted the State's petition for
a writ of certiorari. We shall hold that the evidence was
insufficient to support Pagotto's convictions. Accordingly, we
shall affirm the judgment of the Court of Special Appeals.

## I.

We are mindful that, in an appeal based upon insuffi-
ciency of evidence, it is not the function of the appellate court
to undertake a review of the record that would amount to a
retrial of the case. *See State v. Albrecht,* 336 Md. 475, 478,
649 A.2d 336, 337 (1994). Rather, we must view the evidence
in the light most favorable to the prosecution, and the judg-
ment can be reversed only if we find that no rational trier of
fact could have found the essential elements of the crime. *See
Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61

---

\* Rodowsky, J., now retired, participated in the hearing and conference of
this case while an active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section 3A, he also participated
in the decision and adoption of this opinion.

1. The reckless endangerment statute has been recodified as Maryland
Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 12A 2, effective
October 1, 1996, and was amended by 1997 Maryland Laws Ch. 32 and
1999 Maryland Laws Ch. 34.

L.Ed.2d 560 (1979); *Albrecht,* 336 Md. at 478, 649 A.2d at 337. Fundamentally, our concern is not with whether the trial court's verdict is in accord with the weight of the evidence, *see Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560, but only with whether the verdict was supported by sufficient evidence—evidence which could fairly convince a rational trier of fact of the defendant's guilt beyond a reasonable doubt. *See Albrecht,* 336 Md. at 479, 649 A.2d at 337.

■ In other words, in a sufficiency of the evidence challenge, the appellate court is not to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Rather, the court only asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. *See Albrecht,* 336 Md. at 479, 649 A.2d at 337–38; *Oken v. State,* 327 Md. 628, 661, 612 A.2d 258, 274 (1992).

## II.

The facts of this case are undisputed until the critical moments leading up to the discharge of Respondent's weapon. Sergeant Pagotto and his partner, Officer Stephen Wagner, were both assigned to the Gun Recovery Unit of the Baltimore City Police Department (hereinafter "Department"). The mission of the Gun Recovery Unit was to remove guns from the streets of Baltimore City. Each officer assigned to this unit was trained to look for people with certain characteristics that police profiles indicated were more likely to carry guns. The Gun Recovery Unit frequently used pretextual traffic stops to accomplish their mission. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding no Fourth Amendment violation if police have probable cause to believe driver of automobile is violating traffic regulation, but the stop is to accomplish some other investigative purpose).

The incident in question occurred on the night of February 7, 1996. Officers Pagotto and Wagner were assigned to the Northeastern District of Baltimore in an area called "Little Eastern." This area was selected because it has a high concentration of narcotics trafficking and gun related violence. Pagotto and Wagner were dressed in plain clothes that evening, although they were driving a "marked Tracker," [2] making them easily identifiable as police officers.

At approximately 8:30 p.m., the two officers spotted a white Subaru in the 2600 block of Kirk Avenue. Although the officers stopped the car because the license was displayed improperly, they both testified that their subjective motive in stopping the car was to look for guns.[3] According to Sergeant Pagotto, they decided to stop this particular car because it was in a high drug and gun area and looked suspicious. Officer Pagotto explained the significance of the license tag:

A lot of times people who are going to conceal what they are doing like dealing narcotics or doing a drive-by shooting or even if it is a stolen car, guns and narcotics are synonymous with each other, and they just . . . [remove the tag] to conceal their identification.

In response to the officers' signal to stop, the Subaru pulled over on the 2700 Block of Kirk Avenue. Sergeant Pagotto stopped the Tracker about ten feet behind the Subaru. Both officers left the Tracker and began to approach the Subaru. Officer Pagotto approached the driver's side and Officer Wagner approached the passenger's side. Three people were in the Subaru: Preston Barnes, Damien Jackson, and Ali Austin. Officer Wagner testified that, as they approached the car, he noticed that all three persons were "very excited and moving."

---

2. A "marked Tracker" is a Geo Tracker with police striping, the Baltimore City Police shield on the side of the car, and a red light on the roof.

3. There was some disagreement, reflected in the testimony, about the status of the license tag. Officer Wagner said that it was displayed in the rear windshield; however, Officer Pagotto did not remember the Subaru displaying a license plate at all.

Officer Pagotto testified that, when he was about five feet from the back of the car, he saw the driver of the car, Preston Barnes, tilt his head back and drop his shoulder. As part of his training for the Gun Recovery Unit, Pagotto had been instructed that movements such as these were consistent with the picking up of a weapon or the placing of one under the seat. It was at this time that Pagotto withdrew from his holster his police weapon, a Glock 17 automatic.

Damien Jackson, testifying for the prosecution, stated that, earlier that evening, the three men in the car had stopped to pick up ten bags of "Ready Rock," a form of cocaine. He further testified that, when the police signaled for them to pull over, Preston Barnes exclaimed, "Oh shit, I'm dirty," referring to the fact that he was carrying drugs. Barnes was on probation for a drug conviction, and Jackson testified that Barnes knew that any new convictions would constitute a violation of probation and could result in a minimum of five years in prison.

Jackson also explained an escape plan that he and Barnes had worked out in case they were ever caught in such a situation. The plan was that, if they were stopped while carrying drugs, they would pull the car over and bring it to a stop. The officers would then presumably stop their vehicle and begin to approach the car. When the officers came close to the car, Barnes would "rev up" the engine and take off. The two figured that they would be able to make a clean getaway by the time that the officers made it back to their vehicle, started it, and began pursuit. It appears that it was this plan that Barnes was attempting to implement on the night in question.

As the two officers approached the car, it began drifting forward slightly. Officer Wagner originally believed that it was drifting because the car had parked on a downslope along Kirk Avenue. Both officers were yelling orders at the driver of the car "to stop, put on the brake, put the car in park." Sergeant Pagotto then arrived at the driver's side door with his weapon drawn in his right hand. Two separate versions of

the precise events from this point forward were provided by Sergeant Pagotto, on the one hand, and Damien Jackson and Ali Austin, on the other hand.

Damien Jackson testified that, when Sergeant Pagotto arrived at the driver's side door, Pagotto opened the door and then stepped back two or three feet from the car. He further testified that, as Pagotto stepped back from the door, Pagotto was yelling at Barnes to "[s]top the car, stop the car, or I am going to shoot." It was at this point that Barnes shifted from park to drive and pressed down on the gas pedal. Because there was a car parked in front of the Subaru, Barnes had to move the car toward the center of Kirk Avenue and Sergeant Pagotto. As he did so, Jackson and Austin heard a shot, then heard Barnes exclaim, "Oh shit," and slump over. The car proceeded to crash into a parked car down the street. When it did so, both Jackson and Austin fled the scene.

Sergeant Pagotto's testimony differed slightly. He testified that, as he approached the car, he withdrew his gun from the holster, holding it in his right hand with his finger on the slide of the gun.[4] He then took another two or three steps, and, when he neared the door, the driver opened the door slightly. Sergeant Pagotto had seen a training video that instructed officers to be cautious when a car door opens slightly because many officers had been killed in similar situations. Fearing that he was about to be ambushed by Barnes, he instinctively moved forward to attempt to grab Barnes's arm. Pagotto testified that he had been trained to go into an ambush because it draws other fire towards the attacker.

Pagotto struggled with Barnes with his left hand while his police weapon remained outside the vehicle in his right hand, along his side. Barnes managed to rip his arms away from Pagotto and toward the console. Fearing that Barnes was going for a gun, Pagotto attempted to disengage himself from

---

**4.** The "slide" is a large flat housing that surrounds both the barrel of the gun and other internal mechanisms. When the gun is fired, the "slide" slides to the rear, ejecting the spent shell and then springs back forward, placing another cartridge in firing position.

the car. Pagotto testified that, at this point, he was stuck halfway in the car with his feet outside of the car while the car was rolling forward. When Pagotto heard the engine start, he yelled to Wagner to "get the Tracker," meaning the police vehicle. Pagotto testified that he was then able to free himself of the Subaru just before Barnes put the car into gear. When the Subaru moved out toward him, his hand struck the side of the car, knocking him to the ground, and causing his gun to discharge. Officer Wagner testified that it was while he was getting the Tracker that he heard the shot. He turned around to see Sergeant Pagotto's body falling forward from a position against the car.

The bullet entered the left rear passenger window through the lower left hand corner. It passed between the post that separates the front and rear door and the driver's seat. It then struck the body of Preston Barnes just under his left armpit and continued through his chest, piercing his heart and lung. The trajectory of the lethal bullet was consistent with Sergeant Pagotto's testimony.

### III.

The chief question in this case is whether Pagotto's conduct on that night, "considering all of the factors of the case, was such that it amounted to 'wanton or reckless disregard for human life.'" *Duren v. State,* 203 Md. 584, 589, 102 A.2d 277, 280 (1954) (quoting *Maryland v. Chapman,* 101 F.Supp. 335, 341 (1951)). *See Albrecht,* 336 Md. at 500, 649 A.2d at 348. As such, we must determine if the State produced sufficient evidence from which a rational trier of fact could conclude that Pagotto had not acted as "a reasonable police officer, similarly situated." *Albrecht,* 336 Md. at 501, 649 A.2d at 349.

The State argues that Pagotto was grossly negligent by violating Baltimore City Police Department guidelines in three respects: (1) closing on the victim with his gun drawn;[5] (2)

---

**5.** "Closing" is term used by police to describe the final stages of an approach toward a suspect. There was some discrepancy at trial as to

attempting a one-armed vehicular extrication with his gun in the other hand; and (3) placing his trigger finger on the slide of the gun, rather than under the trigger guard as he approached the decedent's car. Pagotto contends that each of these acts was reasonable under the circumstances.

Each side presented several expert witnesses. The State called four key witnesses as experts on police procedure. They were Major Francis Melcavage, a former instructor at the Baltimore City Training Academy and an expert in defense tactics and use of force; Sergeant Craig Meier, a member of the Firearms Training Unit of the Baltimore City Police Education and Training Division and an expert in the use of force and firearms; Sergeant Timothy Vittetoe of the Maryland State Police, an expert in use of force, defense tactics, police training, and police procedures; and John L. Meiklejohn, an expert in defense tactics, training points and procedures, standards of police conduct, and use of force. We shall review the evidence presented at trial, in the light most favorable to the State, to determine if any rational trier of fact could have convicted the defendant of the crimes charged.

### A.

The first alleged grossly negligent act is that Pagotto closed on the victim with his gun drawn. It is first important to note that three of the State's experts stated that they did not feel that it was inappropriate for Pagotto to draw his gun when he did; the only problem was that he should not have closed with his gun drawn. Sergeant Meier testified that an officer is justified in drawing his weapon anytime that he has a reasonable belief that there is a threat of death or serious injury to himself or others and that Sergeant Pagotto was, therefore, justified in drawing his weapon when he did. He testified, however, that it is inappropriate for an officer to close with his weapon drawn and that it is a violation of general police

exactly at what point "approaching" becomes "closing." Various experts placed the distance at anywhere from an arm's length to ten feet from a suspect.

guidelines. Once Pagotto perceived a threat, he should have returned to his car and called for backup, rather than closing on Barnes. He explained that the rationale for the policy is the concern that, should the officer come too close to a suspect, he could become engaged in a struggle and accidentally discharge his weapon.

John Meiklejohn corroborated Sergeant Meier's testimony, stating that Pagotto was justified in drawing his weapon, but should have retreated to his vehicle upon perceiving a threat. Sergeant Vittetoe's testimony differed only slightly. He testified that, once Pagotto perceived a threat, he should not have drawn his weapon, should not have continued to close, and should have sought cover:

THE COURT: [H]e should have stopped closing as soon as he determined or apprehended a danger, correct?

[VITTETOE]: As he approached and he made the determination that the actions of the driver could either put his life in jeopardy and/or his partner's, indicated in his report, his actions of closing should have ceased at that point. Two things he should have done: disengaged making greater distance and also seeked an area of cover or concealment for his protection and also notify his partner of what he was dealing with at that point so his partner could better defend himself.

The one State witness with a different opinion was Major Francis Melcavage. He testified that, while it is inadvisable for an officer to close with a weapon in hand, it is inadvisable only because of the danger that it poses to the officer and that an officer may, therefore, do so if he chooses:

[DEF. ATT'Y]: So it would be in your mind a violation of a policy or guideline to come within five or six feet of a subject with your gun drawn if you suspected they had a weapon?

[MELCAVAGE]: I don't think that policy has even been delineated. I wouldn't say it was a violation of policy, I would say it was probably inadvisable action.

[DEF. ATT'Y]: Well, but there is a policy that you are familiar with that you should not close with your weapon in your hand, right? Isn't that what you are saying?

[MELCAVAGE]: No, not that I am aware of.

[DEF. ATT'Y]: All right. So you can close with a weapon in your hand?

[MELCAVAGE]: Yes.

The defense presented several witnesses addressing the question whether Sergeant Pagotto was reasonable in closing with his weapon drawn. Detective Jeffries, an original member of the Gun Recovery Unit and an expert in defensive strategies and Gun Recovery Unit practices, testified that, while the Department has a guideline to the contrary, an officer must determine if it is appropriate to close with a drawn gun on a case-by-case basis and that it is within the officer's discretion to do so if he deems it appropriate. In addition, he testified that he has been in twenty-five to fifty situations in which he or someone that he was working with had closed with a drawn gun. Lieutenant Charles J. Key, author of the guidelines that Pagotto had allegedly violated, also testified for the defense. He stated that Pagotto had violated the guideline against closing with a drawn gun. He went on to state, however, that guidelines are discretionary and that Pagotto had acted reasonably under the circumstances.

### B.

The second alleged violation is that Pagotto attempted a one-armed vehicular extrication with his gun in the other hand. The only testimony that described any contact between Preston Barnes and Sergeant Pagotto was from Sergeant Pagotto. He characterized this confrontation in a far different light than that in which the State had characterized it. According to Sergeant Pagotto, he did not attempt to extricate Preston Barnes; rather, he was attempting to defend himself from what he felt was an oncoming attack. Pagotto's testimony on direct examination was as follows:

[DEF. ATT'Y]: What was the next thing you did after pulling the gun from the holster?

[PAGOTTO]: I took about two or three more steps toward the car, and got to about the back door on the driver's side.... [T]hat is when the door sprung open.

[DEF. ATT'Y]: What were you thinking when that door sprung open?

[PAGOTTO]: I was thinking I was going to get shot.

[DEF. ATT'Y]: Why?

[PAGOTTO]: Because I have had training and saw videos where a ... door would open up ... and there would be a shotgun right inside the door ... the shotgun goes off and kills the officer. I also saw a video showing officers being killed as they approached. I just thought at that point in time, I was going to get killed.

\* \* \* \* \* \*

[DEF. ATT'Y]: Why didn't you turn and run back to the Tracker?

[PAGOTTO]: I didn't think of it at the time.

[DEF. ATT'Y]: What did you do instead?

[PAGOTTO]: I went towards the driver.

[DEF. ATT'Y]: And why did you do this?

\* \* \* \* \* \*

[PAGOTTO]: It was the best plan of attack that way to go in and get ahold of him.

[DEF. ATT'Y]: And what are you basing that on when you say it was the best plan of attack?

[PAGOTTO]: Years of experience, and all the time in a possible ambush situation, I was always trained to go into the ambush, drawing any fire towards that person. It was just instinct, I mean, I pushed the door out of the way and grabbed his hand.

Major Melcavage's testimony was most critical of Sergeant Pagotto's attempted extrication. Major Melcavage, who

teaches control tactics and vehicular extrications at the police academy, stated that an officer should always holster his weapon before attempting to remove a driver. He testified:

[STATE'S ATT'Y]: If you have a gun in your hand and you intend to remove a driver from a vehicle through the use of a control tactic, what should you do with the weapon?

[MELCAVAGE]: You would have to holster the weapon.

[STATE'S ATT'Y]: And why is that?

[MELCAVAGE]: Because you need two hands to gain control of an individual or to apply a technique as taught at the academy as I taught. And by keeping the gun in the situation, you are unnecessarily endangering yourself. They can take the gun from you just as well, the subject could take the gun from you just as well as you using it on them, or the gun could go off and you could injure innocent bystanders, yourself, or the subject.

[STATE'S ATT'Y]: Okay. Would that fact change whether the vehicle was stationary or moving?

[MELCAVAGE]: No, sir.

[STATE'S ATT'Y]: If you have your weapon drawn and it is not safe to holster it in order to use the control tactic, what should you do?

[MELCAVAGE]: It is not safe to holster them, you need to seek cover and call for assistance, call for other officers. You have to disengage.

Sergeant Vittetoe testified on this subject as well. He stated that an officer should always holster his weapon before struggling with a suspect because two hands are needed to control a suspect. In addition, the holstered weapon protects against the eventuality that the weapon could be used against the officer. He was, therefore, of the opinion that Sergeant Pagotto should not have attempted to reach into the car with a gun in one of his hands. On cross examination, however, Sergeant Vittetoe testified that, prior to 1994, Maryland State Police Officers were permitted to grab a suspect with one hand while the officer had the service weapon in the other hand.

Detective Kenneth Jeffries, testifying for the defense, stated that it is within an officer's discretion whether to attempt to extricate a suspect with a drawn gun. Lieutenant Key testified that the guidelines are designed for departmental use only and are not to be used as a basis for criminal charges. He further testified that, in evaluating officers, the Department gives the officers wide discretion in applying the guidelines.

## C.

The final alleged violation is that Sergeant Pagotto had his finger on the slide of the gun rather than below the trigger guard as required by Baltimore City Police guidelines. Major Melcavage testified that the current Baltimore City Police Department guidelines require an officer to place his trigger finger below the trigger guard. He further testified, however, that, when Sergeant Pagotto was trained in 1980, the Department issued revolvers. The guidelines at that time did not address the location or placement of the officer's trigger finger. He also stated that the Department first issued a guideline with respect to the trigger finger in 1990, when the Department switched to the Glock 17. He testified that, in 1990, police officers were taught to keep their trigger finger on the slide of the gun. According to Major Melcavage, this standard was changed to the current one sometime in 1993 or 1994. Sergeant Meir essentially corroborated the testimony of Major Melcavage in this respect and also stated that Baltimore City is the only police department in Maryland that has this particular requirement.

Captain Meiklejohn testified that Montgomery County officers, unlike the officers in Baltimore City, are still trained to keep their trigger finger on the slide of the weapon. He further testified that the reason that Montgomery County officers are taught to keep their finger on the slide is because keeping the finger below the trigger guard can slow reaction time in a critical situation. Sergeant Vittetoe also testified as to the Maryland State Police Department's practices in this regard:

[DEF. ATT'Y]: And isn't it true that the Maryland State Police Department trains their officers to also keep their finger in a ready position along the slide of the gun as opposed to under the trigger guard, correct?

[VITTETOE]: That is correct, ma'am.

Lieutenant Key, author of the Baltimore City Police Department guidelines requiring the placement of the trigger finger below the trigger guard, testified for the defense. He testified that Baltimore City is the only police department in the State that requires the placement of the trigger finger below the guard. He further testified that, because Sergeant Pagotto had originally been trained to keep his trigger finger on the slide of the gun, his "muscle memory" would have caused him, in a stress situation, to go back to his original training and past experience. He testified:

> Your body trains itself to do certain things. That applies in this situation because if over the years, and in this case 13 years, your finger is alongside the slide, you cannot eradicate this muscle memory in ... 20 or 30 minutes worth of training. It just won't happen. He's going to go back and do what he did in a stress situation, what he's trained himself to do most frequently.

He continued that, due to these circumstances, Sergeant Pagotto's placement of his finger along the slide of the weapon was reasonable.

## D.

Based on this testimony, the trial judge, in denying the motion for judgment of acquittal, concluded that the evidence was sufficient to send the case to the jury on the charges of involuntary manslaughter and reckless endangerment. The trial judge stated:

> I think the evidence that has been submitted so far has been strong, certainly permissible to conclude beyond a reasonable doubt that there was gross negligence and recklessness in the defendant's conduct.

The intermediate appellate court found that the State had failed to meet its burden of production with respect to gross negligence and reversed the judgment. The court held:

> [T]he evidence shows three or four possible deviations from or violations of departmental guidelines of the Baltimore City Police Department. It shows that the actions of Sergeant Pagotto may well have contributed to the creation of a dangerous confrontation between himself and Preston Barnes. It shows what may be a case of actionable civil negligence.
>
> We hold that it does not show, however, such a departure from the norm of reasonable police conduct that it may fairly be characterized as "extraordinary and outrageous." We hold that it does not show on the part of the law enforcement officer, even if guilty of some negligence in the performance of his duties, a *mens rea* that qualifies as a "wanton and abandoned disregard of human life." The burden of production with respect to gross criminal negligence was not satisfied.

*Pagotto*, 127 Md.App. at 357, 732 A.2d at 965–66. The court based this conclusion, in part, on the fact that the prosecution had failed to present evidence that the violation of a police guideline amounted to an action that was not that of a "reasonable police officer similarly situated" or evidenced a "wanton or reckless disregard of human life." The court stated:

> All of the testimony of all of the experts, save one, made no mention of a key link in the chain of logic that was an indispensable but unspoken part of the State's case. Even granting, *arguendo*, the failure of an officer to follow a departmental guideline, what is the significance of such a failure? The missing premise was vital to the validity of the State's ultimate syllogism of guilt.

*Id.* at 325, 732 A.2d at 948. The only witness to testify as to the significance of an officer's failure to follow departmental guidelines was Lieutenant Charles Key, an expert for the defense and author of the relevant guidelines. Judge Moylan,

writing for the intermediate appellate court, pointed out that Key testified that the police guidelines are used for internal evaluations of the officer only and are highly discretionary.

The Court of Special Appeals also found, in the alternative, that Preston Barnes had removed Sergeant Pagotto from the field of proximate cause by attempting his getaway. The court stated:

> As a completely alternative holding, we also conclude that when Preston Barnes put into motion his predetermined tactic of attempting a vehicular getaway from the detention scene, that criminal act on his part constituted an independent intervening cause that resulted in his own death.

*Id.* at 358, 732 A.2d at 966.[6]

We turn now to determine if the evidence was legally sufficient to convince a rational trier of fact of Officer Pagotto's guilt of involuntary manslaughter and reckless endangerment beyond a reasonable doubt.

## IV.

Upon our independent review of the record in this case, we conclude that the Court of Special Appeals was correct in its determination that there was insufficient evidence to support Pagotto's convictions. Specifically, we conclude that Pagotto's actions on the night of February 7, 1996, when viewed in their totality, were neither grossly negligent nor reckless.

At the close of the State's case, the trial court granted Pagotto's motion for judgment of acquittal with respect to the charge of voluntary manslaughter. The trial court found that the State had presented no evidence from which a rational jury could find that Pagotto had intentionally killed Preston Barnes. Thus, the case went to the jury on the charge of involuntary manslaughter.

---

**6.** Because we find, *infra,* that the State presented insufficient evidence to sustain a conviction, we need not address the intermediate appellate court's alternative holding.

Involuntary manslaughter is a common law felony in Maryland. It is defined as

an unintentional killing done without malice, (1) by doing some unlawful act endangering life but which does not amount to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty.

*Albrecht,* 336 Md. at 499, 649 A.2d at 347. The charge in this case is predicated upon the negligent doing of some lawful act. For the conviction to lie, however, the State must prove more than mere negligence. The State must show a greater degree of negligence or "gross" negligence. *See id.; Duley v. State,* 56 Md.App. 275, 289, 467 A.2d 776, 783 (1983); *Mills v. State,* 13 Md.App. 196, 200, 282 A.2d 147, 149 (1971).

In order for the accused's conduct to constitute gross negligence, "the conduct must manifest 'a wanton or reckless disregard of human life.'" *Dishman v. State,* 352 Md. 279, 291, 721 A.2d 699, 704 (1998) (quoting *Albrecht,* 336 Md. at 499, 649 A.2d at 348). *See Duren v. State,* 203 Md. 584, 590, 102 A.2d 277, 280 (1954). In other words, the accused's conduct, under the circumstances, must manifest such a gross departure from what would be the conduct of an ordinary and prudent person so as to amount to a disregard of the consequences and an indifference to the rights of others. *See Albrecht,* 336 Md. at 500, 649 A.2d at 348; *Duren,* 203 Md. at 590, 102 A.2d at 280.

The defendant was also charged with two counts of reckless endangerment of the two passengers in the car: Damien Jackson and Ali Austin. While involuntary manslaughter requires the death of a person, reckless endangerment does not require that any actual harm occur to another. *See Minor v. State,* 326 Md. 436, 442, 605 A.2d 138, 141 (1992). Maryland's reckless endangerment statute, codified at the time of this incident as Maryland Code (1957, 1992 Repl.Vol.) Article 27, § 120(a), provided, in pertinent part, as follows:

Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to

another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

This statute is aimed at deterring the commission of potentially harmful conduct before an injury or death occurs. *See Minor*, 326 Md. at 442, 605 A.2d at 141. The statute was enacted "to punish, as criminal, reckless conduct which created a substantial risk of death or serious physical injury to another person. It is the reckless conduct and not the harm caused by the conduct, if any, which the statute was intended to criminalize." *Id.* at 441, 605 A.2d at 141. Thus, the focus is on the conduct of the accused. The test to determine whether a defendant's conduct was reckless is

> whether the appellant's misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish.

*Id.* at 443, 605 A.2d at 141.

■■■ A defendant's conduct is typically measured against the conduct of an ordinarily prudent citizen similarly situated. Where the accused is a police officer, however,

> the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer similarly situated. As the intermediate appellate court explained:
>
> > Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se*, if not gross negligence *per se*. A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis. The standard of conduct demanded of a police officer on duty, therefore, is the standard of a reasonable police officer similarly situated.

*Albrecht,* 336 Md. at 501, 649 A.2d at 349 (citations omitted) (quoting, in part, from *Albrecht v. State,* 97 Md.App. 630, 642, 632 A.2d 163, 169 (1993)).

The theory of the prosecution was that the conduct at issue was identical for the charges of involuntary manslaughter and reckless endangerment. The prosecution was predicated upon the theory that Sgt. Pagotto's conduct, i.e., the alleged violations of departmental guidelines, was both a gross departure from the standard of conduct that a reasonable police officer similarly situated would observe, thereby creating a substantial risk of death or serious physical injury to the two passengers, as well as such grossly negligent conduct that manifested a wanton or reckless disregard of human life. Therefore, under the circumstances presented herein, if we find that the evidence provided by the State was legally insufficient to sustain a conviction for manslaughter, then the evidence was also insufficient to sustain a conviction for reckless endangerment.

## V.

We emphasize again that, in reviewing for legal sufficiency of the evidence, we are not sitting as the trier of fact. Rather, we only determine if any rational trier of fact could have found Pagotto guilty. The Court of Special Appeals found that each of the State's alleged violations of departmental guidelines, at best, amounted to an actionable case in civil negligence. We agree.

With respect to Pagotto's placement of his trigger finger on the slide of the gun, the Court of Special Appeals found that the evidence presented was insufficient to support a charge of involuntary manslaughter. The court stated:

We hold that Sergeant Pagotto's placement of his trigger finger along the "slide" of his Glock automatic, whether considered alone or in combination with any other factor, does not remotely generate a *prima facie* case of gross criminal negligence. We are not substituting our weighing of the evidence for that of the jury. We are holding, as a matter of law, that the burden of production as to gross

criminal negligence was not satisfied so as even to permit the jury to consider such a charge. Although Sergeant Pagotto may not have followed a recently imposed and geographically unique guideline, his action in that regard was not inherently wrong or of a *malum-in-se* character.

Had a Maryland State Trooper or a Baltimore County Officer, for instance, ridden along with Sergeant Pagotto on February 7, 1996, and engaged in precisely the same conduct that Sergeant Pagotto did, that State Trooper or County Officer would have been acting with complete propriety with respect to the placement of the trigger finger on a weapon. Had Sergeant Pagotto himself placed his trigger finger on the "slide" of his weapon on February 7, 1993, instead of on February 7, 1996, he would then have been acting with complete propriety. Except for a criminal violation of a local municipal or county ordinance, precisely the same act under precisely the same circumstances cannot be a crime in Baltimore City but not a crime in Baltimore County.

*Pagotto*, 127 Md.App. at 310–11, 732 A.2d at 941. The State's logic leads to the conclusion that a police officer placing his finger on the slide of the weapon is criminally negligent behavior if committed by a Baltimore City Police Officer in Baltimore City, but acceptable, non-criminal behavior if committed by any other police officer anywhere else in the State. The Court of Special Appeals was correct in concluding that this result is illogical.

We also agree with the Court of Special Appeals' conclusion that Sergeant Pagotto's act of closing with a drawn gun was not criminally negligent. The intermediate appellate court held:

Even assuming that "closing" to within a few feet of Preston Barnes constituted ordinary civil negligence, there was nothing in the appellant's behavior to suggest "a wanton or reckless disregard for human life." He approached an inherently dangerous confrontation with his weapon in hand.

Hindsight, indeed, revealed that Sergeant Pagotto's suspicions and fears were well-grounded. Although Sergeant Pagotto did not know it at the time, Preston Barnes was almost certainly committing a felony in his presence—the possession of cocaine with intent to distribute. Rather than risk a violation of probation, Preston Barnes was poised, just as the Sergeant drew near, to initiate a high speed getaway, wantonly running down Sergeant Pagotto in the process if need be. If in a stress-laden situation and for his own self-protection Sergeant Pagotto violated a departmental guideline, he did not thereby commit an act of gross negligence.

*Id.* at 318, 732 A.2d at 945.

The final alleged violation of Department guidelines was Sergeant Pagotto's so-called one-armed vehicular extrication. The Court of Special Appeals found that Sergeant Pagotto had not violated this guideline and, even if he had, it was not behavior that could legally rise to the level necessary to sustain a conviction of involuntary manslaughter. The court stated in this regard:

The testimony of both Major Melcavage and Sergeant Vittetoe dealt with the subject of vehicular extrication as an abstract academic or training exercise. Self-evidently, one can wrestle with an opponent more effectively with two hands than with one. That's the school situation. They analyzed the problem as if Sergeant Pagotto had moved forward *ab initio* with a pre-formed and deliberate plan to perform a one-armed vehicular extrication. Their opinions had no pertinence to an instinctive, split-second reaction, actual or hypothetical, where the right hand is already holding a weapon and where a car door suddenly opens, a foot or two away, in front of one's face. The instantaneous reaction either to "move into the ambush" or to attempt to retreat to the cover of the police cruiser is something that is not concerned with the schoolroom paradigm of a model vehicular extrication.

\* \* \* \* \* \*

The appellant's version [7] of this part of the encounter does not permit a finding that the Baltimore City Police Department guideline as to vehicular extrication had been violated. Even assuming, *arguendo*, that there had been a violation, however, that would be, at most, a *prima facie* case of ordinary civil negligence. Assuming that this is a case in which an officer might be civilly liable for negligence, there was insufficient evidence of the type of wanton and abandoned indifference to human life required to meet the incremental burden of production that must be satisfied before a jury can consider the issue of gross criminal negligence.

*Id.* at 320–22, 732 A.2d at 946–47. We agree with the Court of Special Appeals that the evidence presented at trial, as a matter of law, was insufficient to support a conviction of involuntary manslaughter or reckless endangerment. Sergeant Pagotto's behavior simply did not evidence a "wanton or reckless disregard for human life."

In arguing for legal sufficiency, the State relies heavily on *State v. Albrecht*, 336 Md. 475, 649 A.2d 336 (1994). The State contends that *Albrecht* is dispositive of the instant case because "[l]ike *Albrecht*, Pagotto's case involves issues of: a police officer's use of his service firearm; the officer's placement of his finger with respect to that service weapon; the officer's aiming of his service weapon at the victim; and, the officer's resort to use his service weapon under circumstances in which the victim presented no threat to the officer." In *Albrecht*, a Montgomery County Police officer was convicted of involuntary manslaughter and two counts of reckless endangerment when the shotgun he was holding accidentally discharged, killing one woman. This Court held that the evidence was sufficient to warrant a conviction for both involun-

---

7. In reviewing the sufficiency of the evidence on this point, we accept Officer Pagotto's version of this part of the encounter, as did the Court of Special Appeals, because it is the only version in evidence.

tary manslaughter and reckless endangerment. We conclude, however, that *Albrecht* is distinguishable.

While these two cases are facially similar, there are several key factors present in *Albrecht* that are not present in this case. In *Albrecht,* we noted five factors which elevated Albrecht's behavior from ordinary civil negligence to gross criminal negligence. We stated:

> The State adduced sufficient testimony from which the trial court could have concluded that a reasonable Montgomery County police officer would not have acted as Albrecht did on this occasion, in drawing and racking a shotgun fitted with a bandolier and bringing it to bear, *with his finger on the trigger,* on an unarmed individual who did not present a threat to the officer or to any third parties, in a situation where nearby bystanders were exposed to danger.

*Id.* at 505, 649 A.2d at 350–51.

Not one of the five factors that we specifically identified in *Albrecht* is present in this case. The first factor we noted in *Albrecht* was the drawing and racking of a shotgun fitted with a bandolier. Sergeant Pagotto, however, drew a standard issue police handgun with no alterations. The second factor in *Albrecht* was bringing the gun to bear on the victim. The State produced no evidence that Officer Pagotto was aiming his gun at Preston Barnes when it discharged.[8] The third factor we found of particular importance in *Albrecht* was Albrecht's placement of his trigger finger on the almost universally prohibited position of directly on the trigger of the gun. Officer Pagotto, in contrast, had his finger on the almost universally accepted position of the slide of the gun. The fourth factor was the fact that Officer Albrecht had ascertained that the victim, Rebecca Garnett, was not armed and no longer presented a threat to him at the time his gun discharged. Preston Barnes, however, still presented a substan-

---

**8.** Jackson and Austin testified that Pagotto had aimed his gun at Barnes prior to the discharge in an attempt to get Barnes to bring the car to a stop; however, neither witness was able to determine if Pagotto aimed his gun at Barnes when it discharged.

tial threat to Officer Pagotto. Barnes was inside a car with his hands hidden from view, and was in the midst of an escape attempt when Officer Pagotto's gun discharged. The final key factor we noted in *Albrecht* was that several adults and children were standing directly behind the victim when she was shot. The confrontation in this case, by contrast, took place at night on an empty city street. Based on these distinctions, the Court of Special Appeals concluded:

> This case, key factor by key factor, is the diametric opposite of *Albrecht.* The contrast, moreover, highlights the deficiency of the evidence of gross negligence in this case. Even in *Albrecht* the evidence was close. Here, it did not get close.

*Pagotto,* 127 Md.App. at 334, 732 A.2d at 953. We agree with the intermediate appellate court and find that the State's reliance on *Albrecht* to sustain its convictions against Officer Pagotto is misplaced.

The Supreme Court has explained, albeit in the context of a 42 U.S.C. § 1983 action, but equally apposite herein, the proper prospective from which we must view a police officer's use of force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal citations omitted).

In hindsight, perhaps Sergeant Pagotto should have acted differently on the night of February 7, 1996. His actions "in

circumstances that are tense, uncertain, and rapidly evolving" may even amount to ordinary civil negligence, but they are not such a gross deviation from the actions of an ordinary police officer similarly situated so as to evidence the "wanton or reckless disregard for human life" necessary to support a conviction in this case. We hold, therefore, that Sergeant Pagotto's conduct cannot, as a matter of law, rise to the level of gross negligence. His convictions for involuntary manslaughter and reckless endangerment must be reversed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*

BELL, C.J., dissents.

BELL, Chief Judge, dissenting.

The majority today decides that evidence pertaining to an incident, in which Preston Barnes was killed allegedly as the result of the violation, by police officer Stephen Pagotto ("the respondent"), of three police departmental guidelines; was legally insufficient to sustain the jury verdict convicting the respondent of involuntary manslaughter and two counts of reckless endangerment. To reach its decision, the majority purports not to have weighed the evidence, but to have neutrally concluded that the respondent's conduct, judged from the perspective of a reasonable police officer, similarly situated, was neither grossly negligent nor reckless. *See* 361 Md. 528, 555–56, 762 A.2d 97, 112 (2000).

The respondent's conduct as a police officer is directly in question here.[1] On the night of February 7, 1996 the respondent conducted a vehicle stop of a car being driven by Preston Barnes. The respondent testified that he thought the car may have been stolen because of the placement of the license plate

---

1. As we are required to do, we set out the facts in the light most favorable to the State. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831, 833 (1990).

tag. The respondent also testified that, at about five steps from the vehicle, he saw activity that caused him to fear for his safety and therefore draw his weapon. Thus, he approached Preston Barnes, with his service weapon drawn, and instructed Mr. Barnes to stop the now drifting vehicle. This method of approach was referred to as "closing on the suspect."

Subsequently, when Preston Barnes ignored the respondent's instructions to stop the vehicle, the respondent then reached into the vehicle and attempted to extricate Mr. Barnes with his free hand. This method of extrication was referred to as a "control tactic."

At some point during the control tactic, the respondent's weapon discharged and Mr. Barnes was fatally wounded. An autopsy revealed that Mr. Barnes was wounded while either placing his hands up defensively to protect his face from an onslaught, or placing them on the steering wheel in plain view of the respondent.

The respondent was charged with violation of three police departmental guidelines: closing on a suspect with a drawn weapon; attempting to control a suspect with one hand, with his weapon drawn; and improper placement of his finger on the weapon's trigger, rather than its trigger guard. In Maryland, a violation of police guidelines *may* be the basis for a criminal prosecution, which may, in turn, result in a criminal conviction. *See State v. Albrecht,* 336 Md. 475, 502–03, 649 A.2d 336, 349 (1994) (holding that police officer could be held criminally liable for conduct not in compliance with standard police guidelines, procedures or practices). Thus, to be sure, while a violation of police guidelines is not negligence *per se,* it is a factor to be considered in determining the reasonableness of police conduct. *See Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 139–40, 753 A.2d 41, 61–62 (2000); *Albrecht,* 336 Md. at 502–03, 649 A.2d at 349–50; *Boyer v. State,* 323 Md. 558, 591, 594 A.2d 121, 137 (1991); *Ludwig v. Anderson,* 54 F.3d 465, 472 (8th Cir.1995); *Samples v. City of Atlanta,* 916 F.2d 1548, 1551 (11th Cir.1990); *Kladis v. Brezek,*

823 F.2d 1014, 1019 (7th Cir.1987); *Peraza v. Delameter,* 722 F.2d 1455, 1456 (9th Cir.1984).[2]

As to the first violation, it was alleged that closing on a suspect could result, as it did in this case, in a discharge of the weapon, thereby killing the suspect. The second alleged violation was charged because officers were taught to control suspects with two hands and moreover, in a vehicle situation, attempting a control tactic with a drawn weapon unnecessarily endangered all passengers in the vehicle. Finally, Baltimore City Police Department guidelines specifically mandate that a police officer's trigger finger be placed under the trigger guard, in order to prevent an "accidental" discharge and, consequently, the possibility of an unnecessary killing.

The majority quickly dismisses each of alleged violations of police guidelines. Regarding closing with a drawn weapon, the majority adopts the view of the Court of Special Appeals that the respondent approached an inherently dangerous situation and if, "in a stress-laden situation and for his own self-protection Sergeant Pagotto violated a departmental guideline, he did not thereby commit an act of gross negligence." *Pagotto v. State,* 127 Md.App. 271, 318, 732 A.2d 920, 945 (1999). As to the one-armed vehicular extrication attempt, the majority again embraces the intermediate appellate court's position:

---

**2.** The purpose of the police guidelines, as testimony established, is to determine the reasonableness of police conduct, within the department *itself:*

"[SGT. MEIER]: The purpose of these guidelines is to present the topic of the police use of deadly force in a way which prepares officers to make quick sound decisions under extremely stressful conditions. The information contained herein is consistent with and in support of General Order 288C 2, Rules and Regulations, Rule 3, Firearms. Officers will be held accountable for adhering to the specific requirements of this guideline."

And they apply throughout the department, even to special units:

"[THE COURT]: Does an officer assigned to the gun squad, if I might, have—are there different expectations of that officer with respect to training, fulfillment of duties, policy of the Baltimore City Police Department?

"[MAJ. SHREVE]: No, not at all. They're all expected to adhere to policies and procedure [and guidelines]."

"The testimony of both Major Melcavage and Sergeant Vittetoe dealt with the subject of vehicular extrication as an abstract academic or training exercise. Self-evidently, one can wrestle with an opponent more effectively with two hands than one. That's the school situation. They analyzed the problem as if Sergeant Pagotto had moved forward *ab initio* with a pre-formed and deliberate plan to perform a one-armed vehicular extrication. Their opinions had no pertinence to an instinctive, split-second reaction, actual or hypothetical, where the right hand is already holding a weapon and where a car door suddenly opens, a foot or two away, in front of one's face. The instantaneous reaction either to 'move into the ambush' or to attempt to retreat to cover of the police cruiser is something that is not concerned with the schoolroom paradigm of a model vehicular extrication."

*Pagotto,* 127 Md.App. at 320–22, 732 A.2d at 946–47. On the last issue, the respondent's placement of his trigger finger on the slide of his service weapon—and ultimately the trigger, the majority concludes that because some police departments permit that finger placement, then the conduct cannot be reckless or negligent.[3]

---

**3.** Indeed, the majority today purports "to sit as a jury and set aside the lawful jury's findings of fact." *Anderson v. Fuller,* 455 U.S. 1028, 1033, 102 S.Ct. 1734, 1737, 72 L.Ed.2d 150, 152 (1982) (Burger, C.J., O'Connor, J., dissenting in denial of certiorari). In *Anderson,* the Court decided that the petitioner, who may have been acting as a lookout, was convicted by insufficient evidence, which did not prove, beyond a reasonable doubt that the petitioner intended to burn a home and cause the subsequent death of two children. The evidence in *Anderson* consisted of a neighbors testimony that she saw a young man named Fuller, along with a few other boys, standing in front of the Turner house on the morning of the fire. A 14-year-old, Coleman, testified that he saw Fuller and Meadows, both young men, behind the house. Coleman further testified that Fuller looked up and down the alley while Meadows was setting the fires. Fuller's mother testified that he was home asleep until 9 o'clock on the morning of the fire and therefore, could not have been involved.

The dissenters in *Anderson* noted, *id.* at 1031, 102 S.Ct. at 1735, 72 L.Ed.2d at 151, that the "verdict shows the jury did not believe Fuller's mother and accept his alibi defense. The jury obviously accepted as true the testimony of Coleman and the testimony of two other witnesses

I cannot agree with the majority. Rather than review the sufficiency of the evidence as it is charged with doing, it improperly weighs the evidence considered by the jury. Although appellate courts have the power and are now expected to "pass upon [review] the sufficiency of the evidence to sustain a conviction," *Md. Const. art. 23,*[4] that review does not

---

who said that they saw Fuller at the scene on the morning of the fire." The caution of that dissent, *id.* at 1033, 102 S.Ct. at 1736–37, 72 L.Ed.2d at 152, directed to the *Anderson* majority, is also an appropriate caution to the majority in the case *sub judice:*
> "It is sheer nonsense to suggest that, on this record, the 12 jurors acted irrationally. With all respect, I suggest that the ... majority forgot that it is the function of the jury to determine who is telling the truth. Judges betray their function when they arrogate themselves over the legal fact finder. Either we accept the jury system with the risk of human fallibility or we ought to change the structure of the system and redefine the standard of review.... The [court's below] did not view the evidence in the light most favorable to the prosecution, as the law and their oaths require. If they had, they could not have rationally concluded that the jury could not reasonably reach the result it reached. Instead, the courts reweighed Coleman's testimony, noting that he was young, that he had been placed in a youth house because he ran away from home, and that he attended a 'special school.' Put simply—and bluntly, as this case demands—the ... judges who set aside this ... judgment acted like jurors, not jurists."

4. Article 23 of the Maryland Declaration of Rights, as relevant, provides:
> "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."

For clarification as to the power of the jury to judge the law, see *Stevenson v. State,* 289 Md. 167, 174–75, 423 A.2d 558, 562–64 (1980); *Montgomery v. State,* 292 Md. 84, 89, 437 A.2d 654, 657 (1981); *Calhoun v. State,* 297 Md. 563, 611, 468 A.2d 45, 83–84 (1983); *Brooks v. State,* 299 Md. 146, 149, 472 A.2d 981, 983 (1984); *In re Petition for Writ of Prohibition,* 312 Md. 280, 318, 539 A.2d 664, 682 (1988). *See also, Jenkins v. Smith,* 38 F.Supp.2d 417, 420 (D.Md.1999). In *Stevenson,* the Court construed the broad language of Article 23 as only giving the jury limited power to judge all aspects of the law. Currently, however, the jury's power to judge any of the law is nonexistent, as the Court opined, ("[w]hat it all boils down to now is that the jury's right to judge the law is *virtually eliminated;* the provision, as we have construed it, basically protects the jury's right to judge the facts"). *In re Petition, supra,* 312 Md. at 318, 539 A.2d at 682.

Prior to 1950, the legal sufficiency of the evidence was a question exclusive to the jury, and was not subject to review by this Court. *See,*

involve weighing the evidence. When an appellate court reviews the sufficiency of the evidence needed to sustain a conviction obtained as the result of a criminal trial, rather than measuring the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt, it determines whether there was *any* relevant evidence considered by the jury which would sustain a conviction. *See Briley v. State,* 212 Md. 445, 129 A.2d 689 (1957); *Clarke v. State,* 238 Md. 11, 207 A.2d 456 (1965); *Pressley v. State,* 244 Md. 664, 224 A.2d 866 (1966); *State v. Devers,* 260 Md. 360, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971), *overruled in part by, In re Petition for Writ of Prohibition,* 312 Md. 280, 539 A.2d 664 (1988). Indeed, as even the majority acknowledged, review by the appellate court is limited to viewing the evidence in the light most favorable to the State, to ascertain whether "*any* rational trier of fact could have found the essential elements of the crime beyond a

---

*e.g., World v. State,* 50 Md. 49 (1878); *Deibert v. State,* 150 Md. 687, 133 A. 847 (1926); *Rasin v. State,* 153 Md. 431, 138 A. 338 (1927); *Willie v. State,* 153 Md. 613, 139 A. 289 (1927); *Davis v. State,* 168 Md. 10, 176 A. 281 (1935); *Folb v. State,* 169 Md. 209, 181 A. 225 (1935); *Berger v. State,* 179 Md. 410, 20 A.2d 146 (1941); *Wilson v. State,* 181 Md. 1, 26 A.2d 770 (1942); *Meyerson v. State,* 181 Md. 105, 28 A.2d 833 (1942); *Foreman v. State,* 182 Md. 415, 35 A.2d 171 (1943); *Peters v. State,* 187 Md. 7, 48 A.2d 586 (1946); *Taylor v. State,* 187 Md. 306, 49 A.2d 787 (1946); *Brack v. State,* 187 Md. 542, 51 A.2d 171 (1947); *Jones v. State,* 188 Md. 263, 52 A.2d 484 (1947); *Abbott v. State,* 188 Md. 310, 52 A.2d 489 (1947); *Smith v. State,* 189 Md. 596, 56 A.2d 818 (1948); *Slansky v. State,* 192 Md. 94, 63 A.2d 599 (1949); *Hopkins v. State,* 193 Md. 489, 69 A.2d 456 (1949); *appeal dismissed,* 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950); *Winkler v. State,* 194 Md. 1, 69 A.2d 674 (1949), *cert. denied,* 339 U.S. 919, 70 S.Ct. 621, 94 L.Ed. 1343 (1950). A review of the history of the 1950 Amendment to the Maryland Constitution, Declaration of Rights, Article 23 (previously Article 15, Section 5), shows that the reason for the present day change was because it was believed that common jurors came "from all classes of people, whose education and business cannot as a general rule have qualified them to decide legal questions. . . ." Judge Stedman Prescott, Juries As Judges of the Law: Should the Practice Be Continued?, Address Before the Maryland State Bar Association (June 24, 1955), *in* Transactions: Maryland State Bar Association, 60th Annual Meeting, June 1955, at 255–56. Therefore, because of the restrictive history of this Court's power to determine the sufficiency of the evidence to sustain a conviction, it should sparingly wield the power to overturn a jury verdict.

reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 at 573 (1979); *Bedford v. State,* 293 Md. 172, 175, 443 A.2d 78, 80 (1982). Quite recently, this Court noted that, in reviewing the sufficiency of the evidence to sustain a criminal conviction, *"[w]e do not measure the weight of the evidence;* rather, our concern is only whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Taylor v. State,* 346 Md. 452, 457, 697 A.2d 462, 464 (1997) (emphasis added).

In a review of the sufficiency of evidence, it is not the place of this Court to weigh the finder of facts—the jury's—credibility determination or any of the reasonable inferences flowing therefrom. Indeed, this Court should only *measure,* and not weigh, the evidence to ensure it is based on more than a scintilla of evidence. As such, the evidence on which a conviction rests is sufficient if it measures to "more than surmise, possibility, or conjecture ... [where] such evidence [is] of legal probative force and evidential value." *Ramsey v. D.P.A. Associates,* 265 Md. 319, 324, 289 A.2d 321, 324 (1972) (internal citations omitted). *See also Arshack v. Carl M. Freeman Associates, Inc.,* 260 Md. 269, 276, 272 A.2d 30, 34 (1971); *Fowler v. Smith,* 240 Md. 240, 247, 213 A.2d 549, 554 (1965).

Neither does an appellate court weigh a witness' expert testimony where the "facts upon which an expert bases his opinion ... permit reasonably accurate conclusions as distinguished from mere conjecture or guess." *See Sippio v. State,* 350 Md. 633, 653, 714 A.2d 864, 874 (1998); *State Dept. of Health v. Walker,* 238 Md. 512, 520, 209 A.2d 555, 559–60 (1965). It is then, according to *Simmons v. State,* 313 Md. 33, 42, 542 A.2d 1258, 1262 (1988):

"proper to lay before the jury all the facts, which are necessary to enable them to form a judgment on the matters in issue; and when the subject under investigation requires special skill and knowledge, they may be aided by the opinion of persons whose pursuits or studies or experi-

ence, have given them a familiarity with the matter in hand."

Therefore, if a jury's judgment of conviction is supported by the testimony of a qualified expert, ordinarily the evidence is sufficient. *See Jewell v. State,* 216 Md. 110, 112, 139 A.2d 707, 708 (1958) (stating that expert evidence establishing value of stolen property was sufficient basis for conviction of grand larceny); *Cook v. State,* 84 Md.App. 122, 133, 578 A.2d 283, 288 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991) (opining that expert testimony of police officer permitted jury to conclude conspiracy to distribute cocaine existed and that appellants exercised joint and constructive possession of cocaine); *Sutton v. State,* 4 Md.App. 70, 72, 241 A.2d 145, 146 (1968) (per curiam), *cert. denied,* 251 Md. 752 (1968) (holding testimony of police handwriting expert sufficient to convict); *compare Davis v. State,* 100 Md.App. 369, 389–90, 641 A.2d 941 (1994) (deciding expert opinion based solely on circumstantial physical evidence, not enough to support conviction, notwithstanding that conviction may rest on circumstantial evidence alone); *but see, U.S. v. Duck,* 423 F.2d 1200 (4th Cir.1970) (per curiam) (holding that testimony of handwriting expert, standing alone, was sufficient to support defendant's conviction for forging endorsement on United States Treasurer's check).

Once a jury has performed its task and deliberately decided to convict, appellate courts should be slow to second guess that decision. To be sure, a jury verdict that is based on insufficient evidence may be overturned, but the case is rare indeed, usually involving jury instructions that are inadequate. *See, e.g., Richmond v. State,* 330 Md. 223, 237, 623 A.2d 630, 636 (1993) (failing to instruct jury that prosecution was required to prove specific intent, "resulted in a guilty verdict that otherwise would not have been rendered"); *Franklin v. State,* 319 Md. 116, 571 A.2d 1208 (1990) (overturning conviction because jury instruction that specific intent to kill was not required to establish crime of assault with intent to murder, was clearly erroneous); *State v. Hutchinson,* 287 Md. 198, 205, 411 A.2d 1035, 1039 (1980) (reversing conviction because jury

not instructed it could find defendant not guilty where "the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial").

There are instances, of course, where this Court has overturned a criminal conviction because of insufficient evidence. In *Taylor v. State*, 346 Md. 452, 697 A.2d 462 (1997), a conviction was reversed because, "any finding that [defendant] was in possession of marijuana could be based on no more than speculation or conjecture." *Id.* at 459, 697 A.2d at 465. Judge Raker, for the court, further opined that:

> "Circumstantial evidence may support a conviction if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture, but '[c]ircumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility of guilt or even the probability of guilt. [I]t must . . . afford the basis for an inference of guilt beyond a reasonable doubt.' "

*Id.* at 458, 697 A.2d at 465 (internal citation to treatise omitted).

*Conyers v. State*, 345 Md. 525, 693 A.2d 781 (1997), is another example of this Court's rare reversal of a jury verdict on the basis of the insufficiency of criminal evidence. There, the Court reversed the defendant's conviction for burglary, concluding that the State failed to produce any evidence of an actual breaking and there was "even less [constructive] evidence upon which a jury could base an inference that Appellant's entrance into the house was gained by 'artifice, fraud, conspiracy or threats.' " *Id.* at 558, 693 A.2d 781, 796; *see also Oken v. State*, 327 Md. 628, 663, 612 A.2d 258, 275 (1992) (reversing conviction because evidence of breaking was insufficient). Plainly put, in a determination of "insufficiency of evidence it is necessary to show that there was *no* legally sufficient evidence or inferences drawable therefrom on which the jury could find a defendant guilty beyond a reasonable doubt." *Wilson v. State*, 261 Md. 551, 563, 276 A.2d 214, 220 (1971) (emphasis added). This is so because, as we pointed

out in *Gore v. State,* 309 Md. 203, 214, 522 A.2d 1338, 1343 (1987), *citing Talley v. Dept. of Correction,* 230 Md. 22, 28–29, 185 A.2d 352, 356 (1962), "the individual and total weight assigned to the evidence is within the exclusive province of the jury." *See also* J. Wigmore, *Evidence* § 2251 (Chadborne rev.1981).

The majority correctly points out that, for an accused police officer's conduct to amount to gross negligence, it must manifest, under the circumstances, such a departure from that of a reasonable police officer similarly situated, so as to amount to a disregard of the consequences and an indifference to the rights of others. *See State v. Albrecht,* 336 Md. 475, 501, 649 A.2d 336, 349 (1994); *Duren v. State,* 203 Md. 584, 590, 102 A.2d 277, 280 (1954). In this case, viewed in the light most favorable to the prosecution, the evidence, consisting of expert testimony and inferences drawable therefrom, clearly is legally sufficient. This simply is not a case in which the jury was left to speculate or guess either as to the respondent's conduct or the quality of that conduct. The evidence clearly addressed both issues, and a jury could have found the respondent grossly negligent in failing to comply with the guidelines of the Baltimore City Police Department.

At trial, no less than thirteen witnesses, with six of them, *i.e.,* Major Melcavage, Major France, Sergeant Meier, Mr. Vittetoe, Mr. Meiklejohn and Mr. Key, qualified and testifying as experts, provided evidence regarding the alleged violations of the police guidelines.[5] On the basis of that testimony alone,

---

5. It is useful to sum up the *curriculum vitae* of the various *dramatis persona:* Major Melcavage, a former instructor at the Baltimore City Police Training Academy; Major France, the commanding officer for the Eastern District, Baltimore Police Department; Sergeant Meier, an instructor with the Firearms Training Unit of the Education and Training Division of the Baltimore City Police Department; Sergeant Vittetoe, a former instructor at the Maryland State Police Academy; Mr. Meiklejohn, a retired Captain of the Montgomery County Police Department, who had been involved for years in training members of that department; and Mr. Key, a defense witness, who was a former instructor at the Baltimore City Police Academy and the author of the guidelines in question.

the jury could fairly have been convinced that the respondent's conduct was grossly negligent and that he recklessly endangered the lives of Preston Barnes and the passengers in the car Mr. Barnes was driving.[6]

The record is replete with testimony supporting the jury's verdict convicting the respondent on the basis that closing on Mr. Barnes with his service weapon drawn,[7] was a violation, recklessly done,[8] of police department guidelines. Sgt. Vittetoe testified, on direct examination:

---

6. For example, Sergeant Vittetoe, responding to the question whether, in his opinion the respondent violated his own guidelines, explained:
"Regarding this traffic stop, Sergeant Pagotto, it indicates in the guidelines that if there reaches a point in time where you exercise or use deadly force, certain criteria should be satisfied. The satisfaction, or to satisfy that, the police officer should notify the department what is happening at the location, the information. The police officer should not close distance at that time. If the suspect were to leave, meaning to flee or to drive away at that point, they are not to pursue or to chase, however, to keep them under observation at that point.
　　　*　*　*　*
"At the time that Sergeant Pagotto decided to draw his gun, he made no notification to his partner nor to any other police officers as to what he had or what he could be involved in. With his weapon drawn, he decided or indicated in his report that he closed distance in an attempt to control Preston Barnes which is in direct violation of his own guidelines. He attempted to control the actions of this person physically with one hand, with the gun in the opposite hand. This goes against *all* modern police standards and training."

7. As we have seen, the respondent testified that he believed the car that he stopped had been stolen. This testimony is not indicative of a *routine* traffic stop.

8. The passengers in the Barnes car testified to the respondent's use of his service weapon. Mr. Thompson stated that the only reason Preston Barnes was scared was because the respondent "hopped out of the car with the gun in his hand." The other passenger, Mr. Austin added, on cross examination:
"[STATE'S ATT'Y]: The officer you saw get out of the police vehicle with the gun in his hand, what did he do?
"[MR. AUSTIN]: He went to the driver's side pointing the gun at him.
"[STATE'S ATT'Y]: Driver's side of whose car?
"[MR. AUSTIN]: Preston's car.
"[STATE'S ATT'Y]: Okay. And, you say he did what with the gun?
"[MR. AUSTIN]: He was pointing it at him."

"If [Pagotto] says that he stopped [the car] for suspicion of being stolen, this elevates the stop from not a routine, unknown risk stop, but this is now a high risk stop because you don't know the other components involved in this, exactly how was the car taken. To me [closing] is reckless because if this is not a routine or unknown risk traffic stop, Sergeant Pagotto should have never left his vehicle or the area surrounding his vehicle.

&ast; &ast; &ast; &ast; &ast; &ast;

"His closing as we've heard in here, the closing of the distance, should have ceased when Sergeant Pagotto felt that something was wrong with this traffic stop. . . . I thought that Sergeant Pagotto was reckless in closing the distance, in having his gun out."

Sgt. Vittetoe was corroborated by the following testimony elicited from Major France on cross examination:

"[DEF. ATT'Y]: All right, and what is the training of Baltimore City police officers on closing with a gun in your hand?

"[MAJ. FRANCE]: Closing with a gun in your hand is not good training. It's not part of our training.

"[DEF. ATT'Y]: Why not?

"[MAJ. FRANCE]: I believe for a couple of reasons. One it limits your mobility. Two, you have nowhere else to go if you need the other hand and it's a situation where there's lethal force required, and, three, the gun can be taken from you and used against you."

Several other witnesses, i.e., Officer Wagner, Major Melcavage, Sergeant Meier, Mr. Key, and the respondent himself, provided further corroboration. Officer Wagner testified that an officer is not supposed to close with a gun in hand because "the assailant is close enough he can take that gun away from you and use it on you . . . you can struggle, whatever." Major Melcavage testified that if a handgun is introduced into a closing situation, then you "*unnecessarily* endanger the police officer, the subject you are trying to control, or anyone else." Sergeant Meier testified that closing with the suspect with the

weapon drawn may end up in a "struggle over that weapon, a discharge of that weapon which may injure or kill the police officer, or may injure and kill the suspect or any innocent bystanders that are around." Mr. Key, the defense witness, even stated that the respondent should not have closed with his weapon drawn because it was "not consistent with guidelines."

Moreover, there was testimony, including that of the respondent, indicating that the respondent was familiar with the applicable guideline. Sergeant Meier testified that on the 1994 in-service training test, the respondent correctly answered the question of whether an officer should close on a suspect with a drawn weapon. Mr. Meiklejohn testified that on the 1995 in-service training test, the respondent again correctly answered the question regarding closing on a suspect. The respondent himself conceded his actual knowledge of the applicable guideline:

"[OFFICER PAGOTTO] (reading): An officer should not close with or tackle a running suspect but should direct other units to contain him or her. . . . If possible, officers should not close with suspects to frisk or handcuff until backup officers arrive to assist. . . . Maintain a safe reactionary distance-ten feet or more when the pistol is drawn. . . . If the suspects run, pursue them but do not close with or tackle them.

"[STATE'S ATT'Y]: Okay. Now, are you familiar with those concepts?

"[OFFICER PAGOTTO]: Yes, sir.

\* \* \* \* \* \*

"[OFFICER PAGOTTO] (reading from 1995 in-service training test): Closing with a suspect with your weapon drawn could very likely result in the suspect grabbing the officer's weapon?

"[STATE'S ATT'Y]: And the answer to that is what?

"[OFFICER PAGOTTO]: True.

"[STATE'S ATT'Y]: And you answered it correctly?

"[OFFICER PAGOTTO]: Yes, sir."

There was also evidence that supported the jury's finding that the respondent attempted a one-armed vehicular extrication in violation of police regulations. Major Melcavage, on direct examination, testified why a one-armed vehicular extrication was, and is, improper:

"[STATE'S ATT'Y]: Was part of the training [you provided to defendant] ever to use or hold a handgun in one hand while applying a defense tactic?

"[MAJ. MELCAVAGE]: No, sir.

"[STATE'S ATT'Y]: Why is that?

"[MAJ. MELCAVAGE]: No. Because all the techniques I know that I taught required two hands. Plus, if you enter the handgun into the equation, you unnecessarily endanger the police officer, the subject you are trying to control, or anyone else.

"[STATE'S ATT'Y]: Now would this training be altered in that aspect whether the person who the defense tactic is being applied to is either on the street or in a vehicle?

"[MAJ. MELCAVAGE]: No, sir.

"[STATE'S ATT'Y]: If you have a gun in your hand and you intend to remove a driver from a vehicle through the use of a control tactic, what should you do with the weapon?

"[MELCAVAGE]: You should holster your weapon.

"[STATE'S ATT'Y]: And why is that?

"[MELCAVAGE]: Because you need two hands to gain control of an individual or to apply a technique as taught at the academy as I taught. And by keeping the gun in the situation, you are unnecessarily endangering yourself. They can take the gun from you just as well, the subject could take the gun from you just as well as you using it on them, or the gun could go off and you could injure innocent bystanders, yourself, *or the subject.*

"[STATE'S ATT'Y]: Okay. Would that fact change whether the vehicle was stationary or moving?

"[MELCAVAGE]: No, sir.

"[STATE'S ATT'Y]: If you have your weapon drawn and it is not safe to holster it in order to use the control tactic, what should you do?

"[MELCAVAGE]: It [sic] is not safe to holster them, you need to seek cover and call for assistance, call for other officers. You have to disengage."

There was more testimony which a reasonable trier of fact could have relied upon in finding that the respondent's conduct was grossly negligent. Sgt. Vittetoe added:

"At one point in time in Sergeant Pagotto's report he had indicated that he reached in for a control tactic on [Preston Barnes]. That goes beyond modern police standards. There is nothing that I know of today where a police officer controls someone with one hand and with a gun in the other. And this is for a reason. First of all, it's difficult to control somebody with one hand. You don't know of their physical size, strength, abilities, or anything else, and it generally requires two hands. Also, for the protection of the firearm, once you take it out and are dealing with a suspect, you don't want to present that gun to that person because that weapon can now be used against you. If an altercation were to occur at that point in time, it could not only deal in injuries involving the person you are dealing with or other innocent parties that may not be in that conflict, for example, passengers in the vehicle or innocent civilians standing away from this particular scene...."

Major Melcavage testified, on cross examination, that approaching an open car door with a gun in hand and reaching into that car as a defense tactic is a violation of the standard and "is not in keeping with the training of the police academy." Major France agreed:

"[DEF. ATT'Y]: In other words, that door opens and he can't see everything going on and he makes a decision for his own protection to get that guy—and to reach in and get that guy for his own protection, you really think that's a problem?

"[MAJ. FRANCE]: I have a problem with that."

Mr. Meiklejohn opined that the respondent "should have never been up to that vehicle close enough to where he's reaching in. I believe that reaching in is extremely reckless on his part."

One of the passengers, a Mr. Jackson, testified on direct examination:

"[MR. JACKSON]: The only reason why Preston was scared, [Officer Pagotto] hopped out of the car with the gun in his hand.

"[DEF. ATT'Y]: The car was drifting?

"[MR. JACKSON]: He had to hold his hands on the steering wheel.

"[DEF. ATT'Y]: The car was drifting because he wanted it to drift?

"[MR. JACKSON]: No, it was something with the automatic.

"[DEF. ATT'Y]: Are you telling me that he couldn't put his foot on the brake and stop that car?

"[MR. JACKSON]: Yeah, it was on the brake.

"[DEF. ATT'Y]: Well, then why was the car moving if he didn't want it to move?

"[MR. JACKSON]: It wasn't in park.

"[DEF. ATT'Y]: I understand—the car—you understand—

"[MR. JACKSON]: He was nervous. In the car he was nervous.

"[DEF. ATT'Y]: I understand he was nervous, but if the car is in drive and his foot is off the gas and on the brake won't the car stop?

"[MR. JACKSON]: Maybe because he thought the car was in park."

Adding a moving vehicle to the equation, testimony revealed, makes what the respondent did more dangerous and reckless.[9] Sergeant Vittetoe addressed the issue on direct examination:

---

**9.** It is uncontroverted that Preston Barnes was attempting to flee the scene and that the Subaru was moving. But, as *Sergeant Meier* testi-

"[STATE'S ATT'Y]: Sergeant Vittetoe, would [your opinion that Officer Pagotto was reckless the night in question] be altered in any way or influenced if there were evidence in the case that Preston Barnes was fleeing from the police at the time of the shooting?

"[SGT. VITTETOE]: Yes, sir, it would change.

"[STATE'S ATT'Y]: And how's that?

"[SGT. VITTETOE]: First of all, it would worsen. I would feel that his actions would be more so reckless and against his agency policy. His policy or guidelines do indicate that they are not supposed to chase after someone fleeing. Yes, they are to observe them and do certain things but not to chase them, particularly with your gun out. So I would look at that as being even more so reckless than my previous statement."

Nor is there evidence that Mr. Barnes did anything justifying the respondent's actions. Mr. Barnes' hands were visible at all times after the respondent approached the car. Mr. Jackson testified that even when the respondent opened the car door,[10] Mr. Barnes only placed his hands near his face in a defensive gesture. On cross examination, Mr. Jackson continued to assert that Preston Barnes' hands were visible.[11]

---

fied—"I think Preston Barnes had a reasonable expectation to believe that he would not be shot for fleeing from a simple traffic stop."

**10.** The respondent maintains that he made the "move into ambush" because the car door suddenly "sprung open." Curiously, the majority adopted the respondent's version of how the car door opened because it was "the only version in evidence." 361 Md. 528, 553 n. 7, 762 A.2d 97, 110 n. 7 (2000). On the contrary, it was not the only version in evidence because Mr. Jackson testified that *the respondent actually opened the door* and initiated the "move into ambush." Although the majority initially mentioned the existence of Mr. Jackson's testimony, see 361 Md. at 537, 762 A.2d at 102, it unfortunately neglected to adopt that version. According to the correct standard of review, it is that testimony which should have been accepted, because it is more favorable to the State.

**11.** The colloquy was as follows:

"[MR. JACKSON]: Uh—huh, but when the cop opened the door his hands were on the black [dashboard].

This testimony was corroborated by that of the Deputy Chief Medical Examiner. Regarding the location of Mr. Barnes' hands just prior to being shot to death, he testified that the wound path was both consistent with Preston Barnes' hands being on the steering wheel and with his hands up to protect his face.

The testimony of Officer Wagner regarding his actions during the traffic stop, that he never drew his gun and neither received any communication from the respondent indicating the need to do so, is both relevant and telling. In particular, Officer Wagner testified:

"[STATE'S ATT'Y]: Was there any activity in the vehicle that you could observe that would cause you to draw your weapon?

"[OFFICER WAGNER]: There [sic] were very excited and moving, but none to make me draw my weapon, no. . . .

"[STATE'S ATT'Y]: At any time during the course of this car stop did you receive any communication from the defendant that would indicate you should be concerned or draw your weapon?

"[OFFICER WAGNER]: No.

\*    \*    \*    \*    \*    \*

"[STATE'S ATT'Y]: Is there any practice or protocol that should kick in when a—one officer in a team of two makes observations on the street that would be important to the other officer?

"[OFFICER WAGNER]: The officers should communicate to what they see and observe in the vehicle.

"[STATE'S ATT'Y]: All right. So if one officer sees activity that he believes is suspicious of an armed individual in the vehicle such that he draws his weapon, that should be communicated to the partner?

---

"[DEF. ATT'Y]: His hands were on the black, not on the steering wheel. Now, which version are you telling the jury today?
"[MR. JACKSON]: It was in front of him—they was in front of him. They was in front of him. [Officer Pagotto] could see his hands."

"[OFFICER WAGNER]: Should be."

The jury also heard testimony, which it could have believed, and obviously did, regarding the third allegation, the placement of the respondent's trigger finger on his weapon's slide, and how that violation of the guidelines amounted to gross negligence. Major Melcavage testified as to why there is a requirement that the finger be placed under the trigger guard: to avoid "an accidental discharge, shooting the weapon off, unnecessarily injuring somebody." He explained on cross examination, the reason for the change of the requirement from placing the finger on the slide,[12] i.e., "at times at the Police Academy, there were accidental discharges with them, with them like this (indicating placement)."

The State also elicited testimony from Sergeant Meier regarding his expert opinion that the violation of the finger placement regulation was the cause of death of Mr. Barnes:

"[STATE'S ATT'Y]: Sergeant Meier, do you have an opinion, based on the statement rendered by the defendant in this case, whether his actions caused the death of Preston Barnes?

"[SGT MEIER]: Yes.

"[STATE'S ATT'Y]: What is it?

"[SGT. MEIER]: I believe his actions did cause the death of Preston Barnes by having his finger on the trigger of a weapon when he shouldn't have, for one thing, and closing with an individual that he felt could bring great harm or even death to him."

And from Mr. Meiklejohn, the following testimony was elicited:

"[STATE'S ATT'Y]: Mr. Meiklejohn, if the defendant had his finger where it was supposed to be according to his training, this discharge never would have taken place?

"[MR. MEIKLEJOHN]: It's my opinion that your statement is correct."

---

**12.** Officer Pagotto testified he believed his trigger finger was along the slide instead of where it should have been, under the trigger guard.

Finally, it is significant that there was evidence from which the jury could conclude that the respondent's life was not in immediate danger. Mr. Meiklejohn testified to reading the respondent's statement and seeing "nothing that shows that his life is in immediate danger of death or serious bodily injury."

Thus, the State produced evidence, which, if accepted, proved that the respondent initiated the vehicle stop in question on an admittedly pre-textual basis. Having made the stop, he left his police cruiser and closed on the "suspects" with his service weapon drawn. When the driver of the car failed to come to a complete stop and, in fact, attempted to flee, the respondent, with gun still in hand and his finger on the trigger, opened the door of the drifting car in an effort to effect an one-armed vehicular extrication. Certainly the respondent's conduct—closing with a drawn weapon, attempting a one-armed vehicular extrication and placing his finger on the trigger slide rather than the under the trigger guard-violated departmental guidelines and, based on expert testimony, was reckless and criminally negligent. As a result of that conduct, Mr. Barnes was shot and killed. The jury accordingly was presented with ample evidence on the basis of which it could, and obviously did, convict the respondent.[13]

---

**13.** But there was also ample evidence from which the jury could have inferred the respondent's guilt. Of significance in that regard is evidence contradictory to the respondent's version of the events, thus undermining the respondent's credibility. The respondent contended that his weapon accidentally discharged when he hit his hand against the vehicle as it sped away, and as he was falling to the ground. But the jury had before it testimony indicating that perhaps the respondent's gun did not discharge accidentally.

First, Sergeant Donald Kramer, a firearms expert, testified that ten and a half pounds of pressure was needed to be exerted on the trigger of the respondent's service weapon before it would release. Such a blow, of ten and a half pounds of pressure on a concentrated area, should leave a bruise. However, Major France, a 26 year police veteran—trained to observe, nor Major Shreve, a 31 year police veteran—also trained to observe, saw any signs of injury to the respondent's hands directly after the shooting.

Second, Sergeant Kramer testified that when an officer shoots while falling down, as the respondent maintained he did, the trajectory of a

As the majority and I agree, the conduct of the respondent must be viewed from the eyes of a reasonable similarly situated police officer. In this case, we need look no further than the respondent's partner. Officer Wagner, who was present on the night in question, testified that had he observed dangerous activity then he would have "discarded my

---

bullet will be in an upward direction. The Deputy Chief Medical Examiner testified that the angle of the single bullet was slightly down through the window, not up.

Third, the respondent testified that the increased speed of the car *caused* the "accidental discharge." In contrast, Mr. Jackson testified that it was the "accidental discharge" which *caused* the increased speed of the car:

"[MR. JACKSON]: Well, the whole time, like I say the car was still drifting, the officer was beside the car still trying to get him to stop it.
"[STATE'S ATT'Y]: Okay. what happened after he pulled off?
"[MR. JACKSON]: I heard a shot.
"[STATE'S ATT'Y]: And, what happened when you heard the shot or just after you heard the shot?
"[MR. JACKSON]: Well, Preston said 'oh, shit.' Then that's the last I heard and then the car started—the car started speeding up.
\* \* \* \*
"[MR. JACKSON]: We didn't start going fast *until* Preston was shot."

Additionally, there was evidence of other violations of police regulations, the tendency of which is to suggest that the respondent attempted to cover up his reckless deviations from the Baltimore City Police Guidelines. Exemplary of this evidence is that involving the respondent's failure to notify his supervisor that he had been involved in a shooting, the respondent's leaving the scene of the shooting, the respondent's failure to go directly to headquarters from the scene—while placing unofficial telephone calls and conducting unofficial meetings on street corners and the fact that the respondent waited nearly three weeks before giving an official statement of his version of the events surrounding the shooting. The jury heard testimony concerning each of these acts and the explanation as to why there were violations.

There was even conflict concerning why the respondent left the scene of the shooting. He testified that he left the scene because he feared for his safety due to the "hostile" nature of "about twenty" citizens. But, the jury heard testimony from Major France that perhaps the hostility was fabricated or perceived. Major France stated that, although people did form, he did not recall a crowd being there initially "at that time." He also stated that people formed "ten to fifteen minutes [later] and the people who formed I later found out who they were. So there were people coming to the location from other places." Sergeant Parker, the respondent's immediate supervisor, also testified that a crowd of maybe twenty, including police officers, formed, but significantly indicated that, as far as he was concerned, "there wasn't anything unusual about [the] crowd."

flashlight, pulled my weapon and used the radio that I had to call for additional units or a uniform backup." Thus, he would not have closed on the "suspects" with a drawn police weapon, and in fact, saw no need to ever draw his weapon. Neither would he have opened the vehicle door, or had his finger on the trigger of his weapon while attempting a one-armed vehicular extrication.

The latest statement of Maryland law in this area is *Albrecht, supra.* In *Albrecht,* this Court, with Judge Raker also writing for the majority, upheld the conviction of a police officer who killed a civilian during a vehicle stop, following however, a chase, concluding that the record was "replete with evidence from which the trial court could have concluded that Albrecht did not comply with Montgomery County departmental guidelines, procedures or practices." *Id.* at 502–03, 649 A.2d at 349. As in *Albrecht,* "[u]ltimately, deadly force was used, without justification, and [Mr. Barnes] was killed. [I] conclude that sufficient evidence was presented from which a rational trier of fact could have found that [the respondent's] actions on [February 7, 1996], in their totality, were both grossly negligent and reckless." *Id.* at 486, 649 A.2d at 341.

To be sure, the facts and circumstances surrounding the police shooting in *Albrecht* differ significantly from those in this case. There, Officer Albrecht and Officer Thomas responded to the scene of a stabbing. When they arrived, they learned that the suspects, one whom Albrecht knew by name, might be armed and had fled the scene in a green Chevrolet driven by Rebecca Garnett. The officers spotted the green Chevrolet and gave chase. Although they lost the vehicle, further searching revealed it parked in a neighborhood parking lot. Exiting his cruiser, Albrecht yelled "Stop! Freeze!" and, at that time, removed his customized shotgun from its rack inside his vehicle, immediately placed a shotgun shell in the chamber and "racked" the shotgun into its final stage of firing capability. He then aimed the shotgun directly at Garnett, who at that time posed no threat or danger to any other person. Taking account of the facts and circumstances in that case, *i.e.,* Albrecht's drawing and racking of a shotgun

fitted with a bandolier and bringing it to bear, with his finger on the trigger, on an unarmed individual who did not present a threat to the officers or any third parties and in a situation where nearby bystanders were exposed to danger, we rejected Albrecht's argument that the shooting was unintentional and thus not reckless. We reasoned, 336 Md. at 486, 649 A.2d at 341:

> "[T]he evidence was sufficient to establish that, notwithstanding the fact that Rebecca Garnett did not pose any danger to either Albrecht himself or to third parties, Albrect took substantial steps to use deadly force against her—to wit, racking his shotgun and aiming it, with his finger on the trigger, at Garnett. Ultimately, deadly force was used, without justification, and Rebecca Garnett was killed. We conclude that sufficient evidence was presented from which a rational trier of fact could have found that Albrecht's actions ... in their totality, were both grossly negligent and reckless."

The majority notes that, although "the two cases are facially similar, there are [five factors specifically identified in *Albrecht* ] that are not present in this case." 361 Md. at 554, 762 A.2d at 111. That is true, of course; however, that is also to be expected. These cases are fact specific and therefore must be decided on their unique facts and circumstances. Consequently, simply because all of the same facts and circumstances that informed the Court as to the actions of Albrecht, in that case, do not exist in this case, does not mean that the reasoning underlying *Albrecht* does not apply here. In point of fact, the relevant facts and circumstances of the instant case include the placement of the respondent's trigger finger, whether the victim posed a threat to the officer, and whether the officer's actions exposed others to danger, factors also present in *Albrecht*. Analyzing the facts and circumstances of this case, the jury could have concluded, and obviously did, that the respondent had his finger on the trigger of his service weapon, in violation of departmental guidelines; that, while so holding the weapon, he closed on the stopped car and all "suspects," in violation of another departmental guideline; and

that he tried to extricate one "suspect" from the car with one hand, while continuing to hold the weapon, with finger on the trigger, in violation of yet another departmental guideline. Because there was evidence that Mr. Barnes' hands were not hidden from view, and, in fact, were on the steering wheel or the dashboard, the jury could have and in all probability did, conclude that the two passengers in the car driven by Mr. Barnes were exposed to danger, thereby rejecting the "finding" made by the majority that the confrontation "took place at night on an empty street." 361 Md. at 555, 762 A.2d at 111.

The dissenter in *Albrecht* focused on the aiming of the gun and not the actual discharge thereof, to assert that in the split second before the gun went off the officer was not criminally liable. *Id.* at 507, 649 A.2d at 351 (Murphy, C.J., dissenting). The rationale, in other words, was that we should "freeze in time the split second before the gun went off and inquire as to whether, at that instant Officer Albrecht could have been found guilty of gross criminal negligence and reckless endangerment or not." *Id.* at 508, 649 A.2d at 352. We rejected that argument, *id.* at 505, 649 A.2d at 350; it was wrong then, and it is wrong now. As we pointed out in *Albrecht,* that approach ignores the facts and circumstances that inform the defendant's actions. *Id.* As related to that case, we said, it "ignores the testimony at trial ... and particularly that on the day in question, considering the facts and circumstances facing Albrecht, he should not have had his finger on the trigger, but rather it should have been on the trigger guard." *Id.*

Judge Chasanow, concurring, while also rejecting the freeze frame approach, took the analysis a step further, requiring an analysis of the very act that caused the ultimate injury, the pulling of the trigger, "[b]ut we should not freeze frame and stop our analysis before the trigger was pulled. We cannot access Albrecht's culpability in taking Rebecca Garnett's life and, in doing so, exclude the ultimate act that took her life-pulling the trigger." *Id.* at 506, 649 A.2d at 351. He went on to explain:

"The trial judge found that the act of pulling the trigger was unintentional; he did not find that it was reasonable. The intermediate appellate court assumes the unintentional shooting is a non-negligent shooting. Albrecht did not intentionally pull the trigger, but the trial judge was justified in finding he negligently, carelessly or even recklessly pulled the trigger. There was no external cause for the shotgun discharge, and the fact that Albrecht may have been 'startled into pulling the trigger' of a loaded, racked, and aimed shotgun need not, as a matter of law, excuse his carelessness in doing so. The pulling of the trigger could be found to be a careless act that, when considered along with all the antecedent acts, at least tips the scale to permit a finding of gross negligence."

*Id.* This applies equally well to the facts *sub judice*. Particularly in this case, when one considers that the respondent's service weapon was equipped with three safeties that prevented it from firing unless the trigger was pressed with 10½ pounds of pressure, making it almost impossible to discharge if dropped or struck against an object.

I dissent.