**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 158

September Term, 2014

_____

KIMBERLY JOHNSON

v.

STATE OF MARYLAND

_____

Meredith,
Woodward,
Wright,

JJ.

_____

Opinion by Woodward, J.

_____

Filed: May 28, 2015

On May 21, 2013, appellant, Kimberly Johnson, hit Wayne Vendemia, causing him to fall down and strike his head on the road. Vendemia later died of his injuries. Appellant was subsequently convicted of involuntary manslaughter after a jury trial in the Circuit Court for Baltimore City. The court sentenced appellant to seven years' incarceration.

Appellant presents three questions on appeal, which we have rephrased as follows:[1]

> 1. Did the trial court err or abuse its discretion by modifying the pattern jury instruction for second degree assault?
>
> 2. Did the trial court abuse its discretion in failing to instruct the jury concerning self defense?
>
> 3. Did the trial court err by giving the pattern jury instruction for involuntary manslaughter?

Answering all three questions in the negative, we shall affirm the judgment of the circuit court.

---

[1] Appellant's questions as originally presented are:

> 1. Did the trial judge commit reversible error when he modified a pattern jury instruction over defense counsel's objection and refused to allow defense counsel to argue that Kim Johnson acted reasonably when she slapped a man who had just spit on her?
>
> 2. Did the trial judge err when he refused to give a self-defense instruction even when there was sufficient evidence to support a self-defense theory?
>
> 3. Is reversal required because the pattern jury instruction given on for [sic] involuntary manslaughter contained a gross misstatement of the applicable law of the crime?

## FACTUAL BACKGROUND

At approximately 8:15 PM on May 21, 2013, Baltimore City police officers responded to a call regarding an injured person on the 900 block of De Soto Road. According to witnesses, appellant struck Vendemia, which caused him to fall down in the road and strike his head. Appellant then left the scene. Vendemia was taken to the hospital, where he died a few days later from his head injuries.

On May 23, 2013, appellant was arrested and transported to the police station, where she agreed to be interviewed. Appellant gave a recorded statement in which she told police that she had been driving around on the evening of May 21, 2013, looking for Ray Dillon, with whom she had an on-again, off-again relationship. Appellant stated that upon seeing Vendemia exit Dillon's van, she ran towards the van and yelled at Vendemia, asking where he had come from. Appellant described what happened next:

> I said Wayne um where the fuck did you just come from and of course **I seen that he was all high and you know he was you know spitting when he was talking and he kept you know just saying um it's a coincidence you didn't see me and he spitting and I'm really funny about but not on purpose but he's just spitting on me**. . . . And I'm angry anyway so I hit him in his face on that side of his face I hit him and the man fell and in the ground hit his head in the street. And the trucks and cars are going by and you know of course I'm mad and all but um I'm not going to see nobody get hit or killed or anything.

(Emphasis added).

Appellant stated that she pulled Vendemia up and over to the curb to keep him from being hit by cars driving on the street. Appellant told police that she asked other people

2

nearby for help, but that no one would help her. Appellant told police:

> I mean yes, I did wrong. I was angry, upset and you know and he when he was yelling at back me at it's a coincidence and he started you know spitting on me lips. It was just—I am scared to death of germs . . . . And you know I don't know what nobody's got I don't want be spit you know what I'm saying and I was mad anyway and I hit him one time and I believe if he wouldn't have been so intoxicated he wouldn't have even fell.

Appellant also gave the police a note that she had written to Vendemia after being told

that he was alive but "brain dead," which said:

> Dear Wayne, I'm sorry for making you bust your head. Why did this happen. Please believe I am so sorry. I don't know what makes me crazy and I know you do drugs and when you were yelling at me you spit on me. I am scared of germs and disease. I am scared of everything but I hope you forgive me. I am so, so sorry Wayne.

Appellant was subsequently indicted for second degree murder. On January 28, 2014,

trial began in the circuit court. Over the course of the trial, the State presented the testimony

of, among others, three witnesses to the altercation between appellant and Vendemia.

Bradley Baber testified that he and his girlfriend, Stacy Dillon, were driving on the

900 block of De Soto Road on May 21, 2013, when they saw appellant "dragging a guy off

the street and just saying help" and "someone help me get this junkie out of the street."

Baber testified that he knew appellant as the girlfriend of Ray Dillon, who is Stacy Dillon's

father. Baber testified that no one came to help appellant, and that he saw appellant drop

Vendemia on the concrete "in between the street and the sidewalk," which caused

Vendemia's head to hit the concrete. Appellant then got into her van and drove away.

3

Stacy Dillon testified that she and Baber were driving to her aunt's house on De Soto Road on May 21, 2013. After she parked the car, Stacy saw appellant dragging Vendemia out of the street, then pulling her arms out from under Vendemia and letting his head hit the road. Stacy also testified that appellant called Vendemia a "fucking junkie." When Stacy told appellant, "I think he's really hurt," appellant screamed "No, he's not." Stacy testified that she took Vendemia's pulse and it was "racing."

Hugo Morales testified that he was mowing his front lawn when he observed the following:

[MORALES]: I heard her say where's my fucking old man at, excuse my language and [Vendemia] walked over to her and she asked him again and he said I don't know and she started hitting him and [Vendemia] put his hands up trying to get away from her and she hit him pretty good and [Vendemia] put his hands up just to block the shots and she said I'm going to ask you again where is my old man at and [Vendemia] says I don't know. She says don't you fucking lie to me. I know you know where's he's at, you were just with him. Even though [appellant] didn't mean to do it, but even though somebody else gassed her up and got her all pumped up and mad, she asked [Vendemia] again and at that time she connected a good blow and he fell down and hit his head on the concrete and—

***

[MORALES]: That's when he hit the ground when he fell straight back.

[PROSECUTOR]: What hit the ground?

4

| [MORALES]: | His head. |
| [PROSECUTOR]: | And what did you see? |
| [MORALES]: | Him laying there and I told Jessie[2] to grab her and Jessie says I'm not getting near her and it just happened so quick and then she—well, [Vendemia] wouldn't respond. He was laying on the ground and [appellant] said, oh, he's just fucking faking. He's nodding and I said he's not nodding. He's out. She had a big gulp of soda and she said I'll get his fucking ass up watch this. Threw the whole big cup of coke, a big cup of soda in his face and he didn't respond. So she kicked him and then spit on him. |
| [PROSECUTOR]: | Who kicked him? |
| [MORALES]: | [Appellant] did. |

Morales also testified that he had known Vendemia for about two years, that Vendemia weighed about 100 to 110 pounds, and that appellant outweighed Vendemia by about fifty pounds. Morales said that Vendemia was "purple" and that he believed Vendemia was dead or dying when he called 911. Morales also stated that Vendemia had a bone disease and that he usually drank every day and was a drug user.

Dr. Mary Ripple, the Deputy Chief Medical Examiner of Maryland, testified that Vendemia had a "pretty severe head injury," and that the cause of his death was subarachnoid hemorrhage, or bleeding on the surface of his brain. According to Dr. Ripple, at the time

---

[2] "Jessie" is Jessie Dillon, Ray Dillon's sister and Stacy Dillon's aunt.

5

Vendemia's blood was drawn at 8:47 p.m. on May 21, 2013, he had a blood alcohol content of .059. Dr. Ripple also testified that she had a report that Vendemia had Kennedy's disease, a genetic condition that weakens muscles and causes those afflicted to be more susceptible to injury. Dr. Ripple stated that someone suffering from Kennedy's disease would be "a little less able to react so that makes you a little more suspectible [sic] to injury," but that she did not know the extent of the progression of Vendemia's condition. Dr. Ripple indicated that she did not see any injury to the back of Vendemia's head, but that the impact to both sides of his face indicated that he fell at least twice, or that he was punched on one side of his face and fell on the other.

Detective Steven Matchett, a homicide detective with the Baltimore City Police Department, testified that, after obtaining an arrest warrant, he arrested appellant on May 23, 2013. Detective Matchett stated that appellant was read her Miranda rights and gave the aforementioned recorded statement to police. The court admitted the CD containing appellant's statement without objection from appellant, and the CD was played for the jury.

At the close of the State's case-in-chief, appellant moved for judgment of acquittal as to second degree murder. The State argued in response that there was sufficient evidence to support the charge of second degree murder under the theory of second degree depraved heart murder. The court granted the motion as to second degree murder, and the case proceeded on the lesser included offense of involuntary manslaughter.

Appellant testified in her own defense. The testimony was substantively similar to her

6

recorded statement to the police. Appellant testified that Vendemia exited Ray Dillon's van, that she confronted Vendemia aggressively using profanity, that Vendemia responded by "hollering and yelling at [her]," and that in doing so, he spit in her mouth. Appellant stated that she hit Vendemia one time with the back of her hand, that Vendemia stumbled and fell into the street, hitting his head, that she dragged Vendemia out of the street, and that she then left the scene in her van.

Appellant testified further regarding her reaction when Vendemia spit on her: "I'm so scared of diseases and germs that—it just—all kinds of emotions. I just felt all kind of emotions, scared, you know. I went to my doctor's and got a HIV test right after that. I mean, that's how scared I am of all of that." Appellant said that when she hit Vendemia, "I wasn't thinking, I mean I wasn't thinking nothing. It's just—it was a reaction from the spit in my face. You know, it went in my mouth. It went in my mouth." Appellant agreed that Vendemia never struck her, and that Vendemia fell because she hit him.

As previously stated, the jury convicted appellant of involuntary manslaughter. On March 10, 2014, the court sentenced appellant to seven years' incarceration. Appellant filed a timely notice of appeal. Additional facts will be set forth as necessary to our discussion of the questions presented in the instant appeal.

## DISCUSSION

### Standard of Review

On review of a trial court's ruling granting or denying a proposed jury instruction, "we

7

consider whether the instruction was generated by the evidence, whether it was a correct statement of law, and whether it otherwise was fairly covered by the instructions actually given. We review the trial court's decision not to grant a jury instruction under an abuse of discretion standard." *Gimble v. State*, 198 Md. App. 610, 627 (citations omitted), *cert. denied*, 421 Md. 193 (2011).

**Involuntary Manslaughter and Jury Instruction on Second Degree Assault**

Involuntary manslaughter is a common law felony defined as an unintentional killing done without malice

> (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. To this basic definition other authorities add the qualification, as to the first class of involuntary manslaughter, that the unlawful act be *malum in se*, and not merely *malum prohibitum*, and as to the second and third classes of the offense, that the negligence be criminally culpable, *i.e.*, that it be gross.

*State v. Gibson*, 4 Md. App. 236, 242 (1968) (footnote and citations omitted), *aff'd*, 254 Md. 399 (1969).

In the instant case, it is undisputed that the type of involuntary manslaughter at issue is the "unlawful act" involuntary manslaughter, and that the unlawful act is the battery form of second degree assault. *See* Md. Code (2002, 2012 Repl. Vol.), § 3-203 of the Criminal Law (I) Article; *Snyder v. State*, 210 Md. App. 370, 382 (noting that there are three types of second degree assault: intent to frighten, attempted battery, and battery), *cert. denied*, 432 Md. 470 (2013).

8

The Maryland pattern jury instruction for the battery form of second degree assault provides:

> Assault is causing offensive physical contact to another person. In order to convict the defendant of assault, the State must prove:
>
> > (1)    that the defendant caused [offensive physical contact with] [physical harm to] (name);
> >
> > (2)    that the contact was the result of an intentional or reckless act of the defendant and was not accidental; and
> >
> > (3)    that the contact was [not consented to by (name)] [not legally justified].

Maryland Criminal Pattern Jury Instructions 4:01 (2d ed. 2012) ("MPJI-Cr") (brackets and parentheses in original).

During the court's discussion of the above pattern jury instruction with counsel for the parties, the following colloquy occurred:

> [PROSECUTOR]:    **And then when we get to the 4.01 second degree assault battery instruction I believe that** given the facts of this case that number three that contact was not legally justified that would be only if, A, she was charged with assault and, B, if this was a—there has been some legal defense put forth and right now there is nothing—the way I read the self-defense statute **there's nothing that would generate a self-defense instruction or a legal justification.**
>
> Now, there might be some type of, you know, people might feel—

THE COURT:            I don't disagree.  I mean in the sense that—all right, [defense counsel], even if I gave that instruction what is—I mean I think the jury needs—**what are you saying is the legal justification I guess?**

[DEFENSE COUNSEL]:    **That her response was that of a [sic] ordinary reasonable person in those circumstances.**

THE COURT:            Okay.  Is there an instruction to that effect?  I mean I don't think a jury—I mean I don't know.  They certainly wouldn't know from their own knowledge.

[DEFENSE COUNSEL]:    Are you going to say this jury can't find that her action was reasonable?

THE COURT:            **Well, what I need to do is I need, if I was going to give this instruction, I need to have a definition of legal justification.**  That's what I need.  I don't know if this jury knows what that term means in and of itself.  If we define it for them and it's appropriate, maybe I would give it but I think just saying it's legally justified—**I think there has to be some explanation of that if it's going to be permitted.  So what is the legal justification?**

[PROSECUTOR]:         **I have 5-07 here self-defense instruction from the Maryland Pattern jury instruction** and I can hand it up to Your Honor.  I have a copy.

THE COURT:            I got it.

[PROSECUTOR]:         It's 5-07.

10

THE COURT: **Okay. I mean do you disagree, [defense counsel]? Self-defense isn't the legal justification here.**

[DEFENSE COUNSEL]: **That is correct, Your Honor.**

THE COURT: **Okay. So what is?** You got to tell me what is—I think of legal justification as a generic term and inside that, for instance, self-defense or defense of another or something to that effect. So what is the legal justification and give me that. That's what I need to tell this jury. **What is the legal justification for a defense of this charge?**

[DEFENSE COUNSEL]: **The legal justification is that a person upon whom one has spit has the right to react whether it be to slap or come back the way she described it**.

THE COURT: **Okay. You're saying what? Because this is such provocative [sic] that spitting in itself—**

[DEFENSE COUNSEL]: **Yes.**

THE COURT: Again, that's sort of—I get what you want to argue. I just want to know what legally—**how do I define what you are asking me to do. Defenses, defense of others, defense of (inaudible) duress, entrapment.** I mean, I think there's a—isn't there—to reduce a charge I mean, **provocation or something to that effect.**

[DEFENSE COUNSEL]: I looked at that one. That deals with the reduction of, or heat of hot blood.

11

| THE COURT: | Okay. So tell me—if you can show me some sort—I mean, **if you show me a case that provocation is a defense to assault, I'm happy to use it but I don't—I mean, do you have something like that** [defense counsel]? I mean— |
|---|---|
| [DEFENSE COUNSEL]: | **I do not, Your Honor.** As I indicated when I came in, I was assuming we were under B, not C but that doesn't excuse it. I have a brain chill. |

(Emphasis added).

The trial court then discussed several cases with counsel, including *State v. Rich*, 415 Md. 567 (2010), and *Christian v. State*, 405 Md. 306 (2008), in an attempt to determine if provocation was a legal defense to second degree assault. During the discussion, defense counsel said: "I suggest that the definition of legal justification in this case is whether or not the defendant's conduct was that consistent with the actions of a reasonably prudent individual under the same circumstances." The State disagreed, arguing that provocation is not a defense to involuntary manslaughter, and could only reduce first degree assault to second degree assault. Defense counsel agreed that he had found no case to support his argument, but continued to argue "that the defendant acted reasonably under the reasonable man concept."

The trial court decided not to give the legal justification part of the pattern jury instruction for the battery form of second degree assault. The court instructed the jury, in relevant part:

12

The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove, one, that the defendant committed an assault; two, that the defendant killed [ ] Vendemia and three, that the act resulting in the death of [ ] Vendemia occurred during the commission of the assault.

**So you understand what an assault is. An assault is causing offensive physical contact to another person. So the State must prove then that the defendant caused offensive physical contact to [ ] Vendemia and that the contact was the result of an intentional or reckless act of the defendant and was not accidental**, okay.

(Emphasis added). After the court finished instructing the jury, appellant objected that the court did not give the third element of the pattern jury instruction, namely, that the contact was not legally justified.

## Contentions

Appellant argues that the trial court erred by modifying the pattern jury instruction for second degree assault, because the court should have read the last part of the jury instruction, which would have allowed the jury to consider "the possible effect on liability if there was justification for [appellant's] behavior." Appellant contends that the court's modification to the instruction "expressly prevented defense counsel from arguing that [appellant] should not be convicted because she had behaved reasonably, and thus was legally justified in flailing out at [ ] Vendemia when he spit on her." According to appellant, the jury should have been instructed regarding reasonableness, because if the jury believed appellant's testimony that she "acted reflexively" without thinking when she hit Vendemia, then the jury could have believed that appellant "did not intend to slap [ ] Vendemia, but rather was simply reacting

13

to having her body invaded by the bodily fluids of a known drug and alcohol abuser."[3]

The State responds that the trial court did not err in declining to instruct the jury that in order to find the battery form of second degree assault, the State must prove that appellant's conduct was "not legally justified," because (1) "reasonableness" is not a recognized defense, and (2) the defense of provocation is inapplicable. The State argues that "reasonableness" does not absolve a defendant of criminal liability; rather, the criminal code prohibits conduct that is presumptively unreasonable and thus is subject to criminal sanction. Moreover, the State argues, a provocation defense is inapplicable to the instant case, because provocation may only mitigate the presence of malice; it cannot eliminate all responsibility for an otherwise criminal act. Because second degree assault is a general intent offense that does not require malice, the State concludes that whether appellant was provoked has no effect on her criminal liability.

<u>Analysis</u>

The Maryland pattern jury instruction for second degree assault provides in its entirety:

MPJI-Cr 4:01
SECOND DEGREE ASSAULT

---

[3] Appellant conceded in her brief that "[t]he trial judge correctly instructed the jury by stating the offensive conduct must be intentional or reckless." At oral argument before this Court, however, appellant's counsel asserted that appellant's reflexive response to the spitting negated the *mens rea* necessary to a finding that appellant committed a battery. Such argument relates to an issue of the sufficiency of the evidence to convict appellant. That issue was not raised in or decided by the trial court and thus is not preserved for our review. *See* Rule 8-131(a).

14

The defendant is charged with the crime of assault.

## A
## INTENT TO FRIGHTEN

Assault is intentionally frightening another person with the threat of immediate [offensive physical contact] [physical harm]. In order to convict the defendant of assault, the State must prove:

    (1)    that the defendant committed an act with the intent to place (name) in fear of immediate [offensive physical contact] [physical harm];

    (2)    that the defendant had the apparent ability, at that time, to bring about [offensive physical contact] [physical harm]; and

    (3)    that (name) reasonably feared immediate [offensive physical contact] [physical harm]; [and]

    [(4)    that the defendant's actions were not legally justified.]

## B
## ATTEMPTED BATTERY

Assault is an attempt to cause [offensive physical contact] [physical harm]. In order to convict the defendant of assault, the State must prove:

    (1)    that the defendant actually tried to cause immediate [offensive physical contact with] [physical harm to] (name);

    (2)    that the defendant intended to bring about [offensive physical contact] [physical harm]; and

    (3)    that the defendant's actions were not consented

to by (name) [or not legally justified]. (notes on use)

C
BATTERY

Assault is causing offensive physical contact to another person. In order to convict the defendant of assault, the State must prove:

(1)    that the defendant caused [offensive physical contact with] [physical harm to] (name);

(2)    that the contact was the result of an intentional or reckless act of the defendant and was not accidental; and

**(3)    that the contact was [not consented to by (name)] [not legally justified].**

**Notes on Use**

Use this instruction if the defendant is charged with second degree assault, under Md. Code Ann., Crim. Law I § 3-203 (2012). Use version "A" when the only theory of assault is an intent to frighten type of assault. Use (4) only if the evidence generates justification, e.g., self-defense, and give the instruction for that justification. Use version "B" when the only theory of assault is an attempted battery type of assault. Out of an abundance of caution, use (3) unless it is clear that there is neither justification nor consent. **Use version "C" when the only theory of assault is a battery. Out of an abundance of caution, use (3) unless it is clear that there is neither justification nor consent.** Although version "B" and version "C" may both be applicable, it is unlikely that both version "A" and version "B" are applicable or that both version "A" and version "C" are applicable.

MPJI-Cr 4:01 (emphasis added) (brackets and parentheses in original).

The commentary instructs the trial court to use the third part of the subject instruction

16

"unless it is clear that there is neither justification nor consent." In the instant case, there was neither. There has been no issue raised by appellant regarding consent, and, as the State correctly argues, there is no legal justification, because appellant's asserted reasonable behavior is not a recognized defense to second degree assault.

The law recognizes certain defenses as legal justification for criminal acts: self defense, defense of others, duress, etc. *See, e.g.*, *Lee v. State*, 193 Md. App. 45, 58 ("Defense of others, like self-defense, is a justification or mitigation defense."), *cert. denied*, 415 Md. 339 (2010); *Wentworth v. State*, 29 Md. App. 110, 117 (1975) ("[D]uress, coercion or compulsion is ordinarily a valid defense to a charge of crime."), *cert. denied*, 278 Md. 735 (1976). For a claim of "reasonableness" to be relevant to a determination of criminal liability, that "reasonableness" must be rooted in one or more of the defenses recognized by the law as applicable to the offense at issue. *See, e.g.*, *Christian*, 405 Md. at 323-27 (discussing the applicability of reasonable behavior with regard to a claim of perfect and imperfect self defense). Here, appellant claims that her reflexive response to Vendemia spitting in her mouth was reasonable, but does not tie that behavior to any recognized legal defense. Appellant cites to no authority, and we have found none, for the proposition that, standing alone, reasonableness is a defense recognized as a legal justification for second degree assault.

In our view, the closest recognized legal defense raised by appellant's argument is

17

provocation.[4]  A provocation defense, however, serves only to mitigate the presence of malice and cannot absolve an individual of all criminal liability.  *See State v. Faulkner*, 301 Md. 482, 486 (1984) ("These acts, because they create passion in the defendant and are not the product of a free will, negate malice and thus mitigate a homicide to manslaughter."); *Dennis v. State*, 105 Md. App. 687, 695 (stating that provocation "constitute[s] a mitigating factor sufficient to negate the element of malice [that] thereby reduce[s] murder to manslaughter"), *cert. denied*, 340 Md. 500 (1995).  Because the defense of provocation may mitigate only one criminal offense into another, lesser criminal offense, it follows that, even if the defense of provocation applied in the instant case, any application of that defense would necessarily and ultimately result in a finding that appellant committed *some* lesser criminal offense.

Moreover, second degree assault is a general intent offense that does not require malice.  *See Genies v. State*, 196 Md. App. 590, 601 (2010), *aff'd*, 426 Md. 148 (2012); *see also Wieland v. State*, 101 Md. App. 1, 40 (1994) ("A consummated intentional battery requires a general intent on the part of the perpetrator to hit the victim.").  Because it lacks the element of  malice, second degree assault cannot be reduced by the defense of provocation into some lesser offense.  Indeed, second degree assault has no lesser included offense.  Consequently, an instruction on provocation could not have had any effect on

---

[4] Although, in her brief, appellant disclaims that she is arguing that she "was so provoked by [ ] Vendemia spitting on her that she killed him in a hot-blooded rage," the State has argued extensively the inapplicability of a provocation defense.  Thus we believe it appropriate to briefly address the argument.

whether appellant committed second degree assault as the "unlawful act" for involuntary manslaughter. Accordingly, the court did not err in declining to give the third part of the pattern instruction on the battery form of second degree assault.

## Self Defense Instruction

### Contentions

Appellant next argues that appellant was entitled to a self defense instruction, because "her testimony established sufficient evidence to support a theory [that] Vendemia was the aggressor and assaulted [appellant] first." Appellant asserts that in her testimony, she expressed her belief that "she was in danger of bodily harm via infection or disease," which was corroborated by the fact that she got an HIV test after Vendemia spat on her. Moreover, appellant argues, "[t]he fact that no one . . . was willing to come to [ ] Vendemia's aid after he fell to the ground in the middle of the street added credibility to an argument that [appellant's] fear was objectively reasonable." Appellant also points to the fact that Vendemia spit on her before she hit him to support her argument that Vendemia was the aggressor.

The State responds that appellant's claim of error regarding the court's failure to instruct on self defense is waived for appellate review, because appellant did not object below and in fact affirmatively rejected the court's invitation to consider the instruction's applicability. Additionally, the State argues, the evidence did not generate a self defense instruction, because appellant's recorded statement to the police and her trial testimony

19

showed that she understood the spitting to be accidental, and appellant did not produce testimony that she believed that she was in immediate or imminent danger of bodily harm.

Analysis

We agree with the State that any error on the part of the trial court in failing to give a self defense instruction is not only not preserved for our review, but is affirmatively waived. First, appellant waived her rights on this issue when she did not request a self defense instruction. *See Tull v. State*, 230 Md. 152, 156 (1962) (holding that it was not plain error for the court not to give a self defense jury instruction where the defendant did not request one); *Martin v. State*, 174 Md. App. 510, 520 (2007) ("[A] party waives his/her rights when he/she fails to request an instruction . . . ."); *Cicoria v. State*, 89 Md. App. 403, 426 (1991) (considering Maryland Rule 4-325(e) and determining that, where a party failed to request the court to instruct the jury on a good faith defense, "he waived any possible error"), *aff'd*, 332 Md. 21 (1993).

Second, defense counsel expressly advised the trial court that appellant was not asserting self defense:

> [PROSECUTOR]:       I want to do a little quick—I might want to do a little quick research to see if assault second is a lesser included offense of manslaughter.
>
> THE COURT:       Okay. I thought that was in the instructions somewhere. Somebody asked for that, I don't know.

20

| [PROSECUTOR]: | I asked for it just because of the way manslaughters instruct, but I might ask for it as an actual charge and then secondly I might want to do a little research because **it sounds like he's alluding to its self-defense—** |
|---|---|
| [DEFENSE COUNSEL]: | **No.** |

(Emphasis added).

As previously quoted, when the trial court stated that "[s]elf-defense isn't the legal justification here," defense counsel responded, "That is correct, Your Honor." Later, the court again said: "I think [that defense counsel] is saying it wasn't self-defense. So I mean he's not arguing that." Defense counsel did not correct the trial court.

Even if preserved, the evidence was not sufficient to generate a self defense instruction. There are four elements of self defense:

(1)   The accused must have had reasonable grounds to believe himself . . . in apparent imminent or immediate danger of death or serious bodily harm from his . . . assailant or potential assailant;

(2)   The accused must have in fact believed himself . . . in this danger;

(3)   The accused claiming the right of self defense must not have been the aggressor or provoked the conflict; and

(4)   The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Haile v. State*, 431 Md. 448, 472 (2013) (alterations in original) (citations and internal

quotation marks omitted); MPJI-Cr 5:07.

In the instant case, the evidence was arguably insufficient as to all four factors. The evidence was most clearly insufficient for the fourth factor, because appellant responded with "unreasonable and excessive" force by hitting Vendemia after he spit on her. *Haile*, 431 Md. at 472. There is no evidence of aggressive conduct by Vendemia towards appellant during their conversation. In her recorded statement to police, appellant said that Vendemia was "spitting when he was talking . . . but not on purpose but he's just spitting on me," indicating that even she believed that the spitting was unintentional on Vendemia's part. Accordingly, even if preserved, the trial court did not err in failing to instruct the jury concerning self defense.

**Involuntary Manslaughter Instruction**

The Maryland pattern jury instruction for unlawful act involuntary manslaughter provides:

MPJI-CR 4:17.9
HOMICIDE–INVOLUNTARY MANSLAUGHTER
(GROSSLY NEGLIGENT AND UNLAWFUL ACT)

***

B
INVOLUNTARY MANSLAUGHTER–
UNLAWFUL ACT

The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:

22

(1)     that [the defendant] [another participating in the crime with the defendant]] [[committed] [attempted to commit]] (unlawful act(s));

(2)     that [the defendant] [another participating in the crime] killed (name); and

(3)     that the act resulting in the death of (name) occurred during the [commission] [attempted commission] [escape from the immediate scene] of the (unlawful act(s)).

MPJI-Cr 4:17.9B (brackets and parentheses in original). In accordance with the pattern jury instruction, the trial court in the instant case instructed the jury as follows:

> The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove, one, that the defendant committed an assault; two, that the defendant killed [ ] Vendemia and three, that the act resulting in the death of [ ] Vendemia occurred during the commission of the assault.

Appellant did not object to this instruction.

## Contentions

Appellant argues that the trial court misstated the law when it gave the pattern jury instruction on involuntary manslaughter, because the instruction fails to "inform the jury that the act resulting in the victim's death must be one that typically endangers human life," as required by *United Life & Accident Insurance Co. v. Prostic*, 169 Md. 535, 538 (1936). Appellant argues that MPJI-Cr 4:17.9B eliminates the "endangering life" requirement, which creates a lower standard for conviction.

23

The State responds that appellant's argument regarding the "endangers human life" requirement misstates the law and therefore cannot constitute error. The State points to *Schlossman v. State*, 105 Md. App. 277, 288 (1995), *cert. dismissed as improvidently granted*, 342 Md. 403 (1996), *overruled on other grounds by Bailey v. State*, 355 Md. 287 (1999), and the subsection of Judge Moylan's treatise titled "The Unlawful Act Need Not Be Life-Endangering." The State argues that the law is clear that second degree assault is a *malum in se* offense, i.e., "punishable because it is wrong in itself," and thus the jury need not find that appellant's assault endangered human life in order for her to be convicted of involuntary manslaughter.

Analysis

Because appellant did not object to the involuntary manslaughter jury instruction at trial, this issue is not preserved for our review. Rule 4-325(e) provides:

> **No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury**, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

(Emphasis added). As this Court has explained, "the Rule's salutary function is to provide the trial court an opportunity to correct the instruction before the jury starts to deliberate." *Martin v. State*, 165 Md. App. 189, 197 (2005) (citations and internal quotation marks

24

omitted), *cert. denied*, 391 Md. 115 (2006). Nevertheless, appellant asks us to exercise plain error review. We decline to do so and shall explain.

At the outset, we note that it is well-established that a trial court is strongly encouraged to use the pattern jury instructions. *See Yates v. State*, 202 Md. App. 700, 723 (2011) (noting that we have repeatedly "recommended that trial judges use the pattern instructions"), *aff'd*, 429 Md. 112 (2012); *Minger v. State*, 157 Md. App. 157, 161 n.1 (2004) ("Appellate courts in Maryland strongly favor the use of pattern jury instructions."); *Green v. State*, 127 Md. App. 758, 771 (1999) ("[W]e say for the benefit of trial judges generally that the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions."). Moreover, the pattern jury instructions are drafted by "a group of distinguished judges and lawyers who almost amount to a 'Who's Who' of the Maryland Bench and Bar." *Green*, 127 Md. App. at 771.

Speaking for this Court in *Yates*, Judge Graeff wrote: "This Court has recommended that trial judges use the pattern instructions. Appellant has not cited any case in which a Maryland appellate court has held that a trial court committed plain error in following this recommendation and giving, without objection, a pattern jury instruction." 202 Md. App. at 723 (citations and footnote omitted). At oral argument before this Court, appellant's counsel conceded that since *Yates* was published, still no opinion has reversed a trial court for giving, without objection, a pattern jury instruction. On that ground alone, we would decline to exercise plain error review.

25

However, we note for the benefit of the trial bench and bar that the pattern jury instruction on unlawful act involuntary manslaughter does not misstate the law, as claimed by appellant. The precise issue raised by appellant was addressed and resolved by this Court in *Schlossman*. 105 Md. App. at 284-91. In *Schlossman*, the appellant was convicted of involuntary manslaughter stemming from a battery committed on the victim, which later caused the victim to suffer a fatal heart attack. *Id.* at 281-82. In discussing unlawful act involuntary manslaughter, we said:

> The first classification of involuntary manslaughter, known as unlawful act involuntary manslaughter or misdemeanor manslaughter, can broadly be stated as occurring where one commits a criminal act not amounting to a felony that unintentionally causes the death of another. This overly simplistic statement of the rule is misleading, however, because the rule's specific requirements hinge upon whether the unlawful act was *malum in se* or *malum prohibitum*. *See United Life and Accident Ins. Co. v. Prostic*, 169 Md. 535, 539, 182 A. 421 (1935); *Gibson*, 4 Md. App. at 242, 242 A.2d 575. "An offense *malum in se* is properly defined as one which is naturally evil as adjudged by the sense of a civilized community," *Garnett v. State*, 332 Md. 571, 603 n.12, 632 A.2d 797 (1993); it is an act that is wrongful in itself "without any regard to the fact of its being noticed or punished by the laws of the state." *Black's Law Dictionary* 959 (6th ed. 1990). Unlawful acts that are wrong only because they are prohibited by statute are considered to be *malum prohibitum* acts. *Garnett*, 332 Md. at 603 n.12, 632 A.2d 797 (citation omitted). In the case *sub judice*, appellant concedes that he committed "unlawful acts." We now must determine whether those acts were *malum in se* or *malum prohibitum*."

*Schlossman*, 105 Md. App. at 284-85.

26

We determined that the appellant's acts, which included poking the victim with a stick, urinating on him, and kicking dirt and trash on him while he was passed out, constituted a criminal battery, and thus such unlawful acts were *malum in se*. *Id*. at 285-88. This Court went on to decide "whether an unlawful act that is *malum in se* but is not itself dangerous to life can support a conviction for involuntary manslaughter." *Id*. at 285-86. After reviewing the relevant case law from the Court of Appeals, we concluded:

> [A] homicide resulting from the perpetration of a *malum in se* unlawful act not amounting to a felony is manslaughter, regardless of whether the unlawful act was "dangerous to life." **Because appellant's battery against the victim was a *malum in se* criminal act, we hold that the State was not required to prove that appellant's acts were dangerous to life in order to establish a *prima facie* case of involuntary manslaughter.**

*Id*. at 288 (bold emphasis added).

The Court of Appeals granted a writ of certiorari in *Schlossman*, but later dismissed the writ as improvidently granted. 342 Md. at 403. Over the next twenty years, the Court of Appeals has not overruled *Schlossman*. If the Court had intended to overrule *Schlossman*, it would have expressly done so. *See Moore v. State*, 412 Md. 635, 657 (2010) (stating that "[t]his Court is not in the habit of overruling cases without stating that it intends to do so" (citations and internal quotation marks omitted)). Accordingly, *Schlossman* remains good law today.[5]

---

[5] In her reply brief, appellant asserts that *Schlossman* is not "the controlling standard for unlawful act involuntary manslaughter," because the Court of Appeals "has never recognized this standard." Appellant cites to no authority for such proposition, and we know

(continued...)

27

Nevertheless, appellant cites to several opinions from the Court of Appeals in which unlawful act involuntary manslaughter is defined as an unintentional killing done without malice, "by doing some unlawful act endangering life." *State v. Albrecht*, 336 Md. 475, 499 (1994); *see Corbin v. State*, 428 Md. 488, 513 n.14 (2012); *State v. Pagotto*, 361 Md. 528, 548 (2000); *Dishman v. State*, 352 Md. 279 (1998); *Cox v. State*, 311 Md. 326, 331-32 (1987). None of the cases cited by appellant involve "unlawful act" involuntary manslaughter as is present in the instant case.[6] Therefore, statements in those opinions relating to unlawful act involuntary manslaughter are pure dicta. *See Halliday v. Sturm, Ruger & Co., Inc.*, 138 Md. App. 136, 160 (2001) ("[Dictum] refers to a statement made by a court incidentally or collaterally, and not directly upon the question before it, or upon a point not necessarily involved in the determination of the cause." (citation and internal quotation marks omitted)), *aff'd*, 368 Md. 186 (2002).

In his book, Maryland Criminal Jury Instructions and Commentary § 5.54(C), at 5-204 to -05 (3d ed. 2009), Professor David E. Aaronson discussed the apparent conflict between

---

[5](...continued)
of none. The adoption of appellant's proposition would have the effect of wiping out most of the body of caselaw issued by this Court over the course of its almost fifty years of existence. "[A] reported decision [of the Court of Special Appeals] constitutes binding precedent . . . ." *Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 325 (2007), *aff'd*, 405 Md. 43 (2008).

[6] In *Dishman*, the Court of Appeals "note[d], without deciding, that the facts may also support an instruction on unlawful act involuntary manslaughter . . . . We need not reach the question given our conclusion that the facts generated the gross negligence variety of involuntary manslaughter." *Dishman v. State*, 352 Md. 279, 300 n.10 (1998).

28

the dicta of the Court of Appeals in the aforementioned cases and the holding of this Court in *Schlossman*, and came to the conclusion that *Schlossman* expressed the law in Maryland on this issue. Professor Aaronson wrote:

> The legal significance of offenses that are *malum in se*, *malum prohibitum*, or dangerousness to life were examined in *Schlossman v. State*, 105 Md. App. 277, 659 A.2d 371. In that case, the Court of Special Appeals held that an unlawful act can form the basis of involuntary manslaughter when the act was *malum in se* regardless of whether the act was dangerous to human life, or when the act was dangerous to human life, regardless of whether the act was *malum in se* or *malum prohibitum*. *Id.* at 288-90, 659 A.2d at 376-77. Note, however, that in *State v. Pagotto*, 361 Md. 528, 762 A.2d 97 (2000), the Court of Appeals recently defined involuntary manslaughter as "an unintentional killing done without malice by doing some unlawful act *endangering life* which does not amount to a felony. . ." *Id.* at 548, 762 A.2d at 107-08 (emphasis added). **State v. Pagotto did not deal with unlawful act involuntary manslaughter, but instead involved lawful act grossly negligent manslaughter. Therefore, the language used by the Court of Appeals in *Pagotto* may have been inadvertent and not intended to conflict with the Court of Special Appeals's holding in *Schlossman*.** The Court of Appeals had originally granted *certiorari* in *Schlossman*, but subsequently dismissed *certiorari* as improvidently granted. *Schlossman v. State*, 342 Md. 403, 676 A.2d 513 (1995).

Aaronson, *supra*, at 5-204 to -205 (italic emphasis and alterations in original) (bold emphasis added).

Accordingly, Professor Aaronson's jury instruction on unlawful act involuntary manslaughter states, in relevant part:

> In order for _____ (*insert name of defendant*) to be found guilty of involuntary manslaughter, the State must prove beyond a reasonable doubt that: (1) _____ (***insert name of defendant***) **[or another participant in the crime] committed or**

> **attempted to commit _____ (*insert unlawful act(s)*)** . . . .
>
> ***
>
> **If the defendant caused the unforeseen death of another while committing or attempting to commit an unlawful act, [he] [she] is criminally liable for that death.** In order to convict the defendant of manslaughter, a causal connection between the unlawful act [attempted] [committed] and the death that results must exist, although it is not essential that the ultimate harm that resulted was foreseen or intended. **Any killing, even if accidental or impulsive, is involuntary manslaughter, if committed in the [commission] [attempted commission] [escape from the immediate scene] of the _____ (*insert unlawful act(s)*) .**

*Id.* at 5-203 to -204 (brackets and parentheses in original) (bold emphasis added).

Finally, in his treatise, <u>Criminal Homicide Law</u> § 11.6, at 216-21 ("The Unlawful Act Need Not Be Life-Endangering") (2002), Judge Charles E. Moylan, Jr., stated that the holding in *Schlossman* was "eminently sound." *Id.* at 216. Judge Moylan explained:

> Blackstone's definition of this variety of involuntary manslaughter as the causing of an unintended death "in the commission of some unlawful act" made no mention of any requirement that the unlawful act be dangerous to life. Hochheimer's definition expressly disclaimed any such requirement.
>
> > The offense is manslaughter, if death results from merely unlawful conduct . . . contrary to intention, by means not likely to produce death or mortal injury.
>
> **In discussing in detail this variety of involuntary manslaughter, none of the leading academic authorities, albeit requiring that the unlawful act be *malum in se*, makes any mention of a requirement that it be life-endangering.**

*Id.* (emphasis added) (footnote omitted). Accordingly, we do not hesitate to conclude that

the pattern jury instruction on unlawful act involuntary manslaughter accurately states Maryland law on this crime.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; APPELLANT TO PAY COSTS.**